J-S24044-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P.65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN P. STIVER | : | |
| | : | |
| Appellant | : | No. 907 WDA 2020 |

Appeal from the Judgment of Sentence Entered July 31, 2020
In the Court of Common Pleas of Blair County Criminal Division at No(s):
CP-07-CR-0001897-2018

BEFORE:   DUBOW, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED: SEPTEMBER 27, 2021**

Appellant John P. Stiver appeals from the judgment of sentence of life imprisonment entered in the Court of Common Pleas of Blair County on July 31, 2020, following his convictions of first-degree murder[1] and numerous, related offenses after a five-day jury trial which commenced on January 27, 2020, and ended on January 31, 2020.  Following a careful review, we affirm.

On July 26, 2018, after an unsuccessful drug deal which had occurred earlier that day, Appellant shot and killed David Hoover.  The trial court set forth the relevant facts leading up to the homicide as follows:

> This case boils down to the Appellant, Dillion Bryan and Edward "Cowboy" Clemens lying in wait for Mark Adams and the decedent, David Hoover, in the church parking lot at Bethany Lutheran Church. On July 26, 2018 at approximately 2:16 p.m., there was a prior drug transaction at the Sheetz Store on Chestnut

---

[*] Former Justice specially assigned to the Superior Court.
[1] 18 Pa.C.S.A. § 2502.

Avenue wherein Edward "Cowboy" Clemens rode with the Appellant to the Sheetz Store. Clemens entered the store and made a drug transaction with David Hoover in the men's restroom. The agreement was that Clemens would provide an 8 ball of cocaine for $250. Within the Sheetz Store, Clemens obtained the $250 from Hoover and also provided two Klonopin pills for $10. The two Klonopin pills came from the Appellant as there were prior arrangements between Clemens and the Appellant to obtain such Klonopins, including specifically a text message about obtaining "pins". It was the intent of both Clemens and the Appellant to "burn" Hoover. They had no intent to provide him the 8 ball of cocaine on the date in question. Clemens confirmed that the Appellant was part of the plan to burn Hoover. Clemens claimed that Hoover had stolen $360 from an envelope within his residence at a prior time. Clemens took the $250, returned to [Appellnt's] vehicle, and they drove away. [R.R. # 47, E. Clemen's testimony, 1/28/20, pp. 111-114]. Hoover went to Mark Adam's vehicle and waited. Clemens had told him to wait and that he would be back in approximately 15 minutes. [R.R. #47, M. Adams, 1/28/20, pp. 50-53].

After Hoover and Adams waited about 30-45 minutes, they realized that they had been burned. Hoover tried to call Clemens twenty-five (25) times without success. [R.R. # 54, Detective D. Dey, 1/29/20, pp. 184-189; [R.R. #45, Sergeant Merritts, 1130/20, p. 101], At that time, Adams returned to work. [R.R. #47, M. Adams, 1/28/20, pp. 53-54].

After Adams got off work at 4:00 p.m., he picked up Hoover and they drove through Altoona looking for Clemens with the intent to get their money back. They found Clemens with 2 other people (including the Appellant) in an alley at Third Avenue. Adams revealed to Hoover that he had a bat in the trunk of his white Chevrolet Malibu. Hoover retrieved the bat and walked over toward Clemens and his two companions. Clemens yelled "I'll get your money", at which time the other two individuals (the Appellant and Bryan) got into the Ford Fusion and left. [R.R. #47, M. Adams, 1/28/20, pp. 54-60]. There was ultimately a high speed chase through Altoona wherein Adams and Hoover lost the Appellant and Clemens. [R.R. #47, M. Adams, 1/28/20, p. 60]. The Appellant ultimately drove to the church parking lot and parked the vehicle. Clemens was walking along the alley and then hid behind a dumpster. He also hid hypodermic needles, which were later found by police. [R.R. # 47, Patrolman Trent, 1/28/20, pp. 19-20]; [R.R. # 53, Patrolman M. Angermeier, 1/27/20, p. 188]. When the Appellant arrived on scene and parked his vehicle,

Clemens walked toward the vehicle. The Appellant got out of the vehicle, went to his trunk, obtained the shotgun and put it in his backseat. [R.R. #45, Sergeant Merritts, 11/30/20, pp. 92-93]. The Appellant admitted this in his statement to Sergeant Merritts. The white Chevrolet Impala, in which Adams was driving and David Hoover was a passenger, then stopped in the alley by the parking lot. [R.R. # 47, M. Adams, 1/28/20, pp. 62-63]. Hoover got out of the vehicle, walked around the back of the Appellant's blue Ford Fusion, went along the passenger side, carrying a baseball bat. Hoover did not possess a gun. At no time did Hoover enter the vehicle, nor attempt to enter the vehicle, nor attempt to remove the Appellant or Bryan from the vehicle. At no time did Hoover threaten anyone. The Appellant subsequently backed up his vehicle, reached out the driver's window and shot Hoover with the 12-gauge shotgun that he obtained from his father's residence. The Appellant then drove away at a high rate of speed. [R.R. #47, M. Adams, 1/28/20, pp. 63-67, 81-82].

Clemens confirmed that when he got back into the blue Ford Fusion after the incident (which he claimed he did not witness), that the Appellant stated "I killed him," referring to Hoover. [R.R. #47, E. Clemens, 1/28/20, p. 119].

The forensic pathologist, Dr. Kevin Whaley, testified that Hoover was approximately 10 to 12 feet away from the Appellant when the shot occurred. Hoover subsequently fell to the ground and laid dying in the parking lot, surrounded by a pool of blood. [R.R. #54, Dr. Whaley, 1129120, pp. 145,158-161]. These events were confirmed by the testimony of Mark Adams (whom the jury found to be a credible witness), the surveillance videos of neighbors, and as re-created by the computer generated animation (CGA). The entire incident lasted only approximately 40 seconds. After the shooting, the Appellant was observed speeding down an alleyway, captured by surveillance video. [R.R. #47, Patrolman G. Trent, 1/28/20, p. 32; M. Adams, 1/28/20, p. 67]; [R.R. #45, Sergeant Merritts, 1/30/20, p. 115]. Bryan was in the Appellant's car. An individual who appeared to be Clemens was seen running from the scene. Adams drove his white vehicle around Hoover's body, out the alley, then took a left onto Second Avenue and parked. [R.R. #46, M. Adams, 1/31/20, pp. 37-38]. Adams called 911 and waited on scene until the police arrived. [R.R. #47, M. Adams, 1/28/20, pp. 67-68, 72]; [R.R. #53, Patrolman M. Miller, 1127120, pp. 122-124]; [R.R. #45, Sergeant Merritts, 1/30/20, p. 79].

Trial Court Opinion, filed 3/26/21, at 86-90.

- 3 -

On February 11, 2020, Appellant filed his Post-Trial Motion. Contained therein was a "Motion for a Mistrial based on a Brady[2] Violation" and "Motion to Dismiss Criminal Charges Due to Prosecutorial Misconduct." On February 24, 2020, Appellant filed his Amended Post-Trial Motion wherein he added subsections entitled "Prejudiced Juror Should Not Have Been Allowed to Deliberate" and "Motion for Judgment Notwithstanding the Verdict." Following a hearing on July 7, 2020, the trial court denied Appellant's Post- Trial Motions along with Appellant's Petition to Reopen on July 30, 2020.

Appellant was sentenced on July 31, 2020, to life in prison and concurrent prison terms for his non-merging convictions. On August 26, 2020, Appellant filed a timely Notice of Appeal. The trial court ordered Appellant to file a concise statement of matters complained of on appeal on August 27, 2020, and Appellant complied on September 17, 2020, at which time he presented fourteen (14) issues for the trial court's review.

In his brief, Appellant presents the following Statement of the Questions Involved:

> I. Whether the denial of court-appointed experts to an indigent defendant in a self-defense case to challenge the positions and shot trajectory deprived [Appellant] of his Fifth Amendment Rights and fundamental Due Process.
>
> II. Whether the trial court erred in allowing the Commonwealth to present a Computer-Generated Animation solely based on its version of the incident after denying an indigent [Appellant's]

---

[2] **Brady v. Maryland**, 373 U.S. 83 (1963).

request for a similar opportunity of experts given the severity of the charges and complexity of the evidence.

III. Whether failing to preserve exculpatory evidence – and denial of opportunity to introduce evidence of *Brady* violation – violated [Appellant's] Due Process rights.

IV. Whether impermissible juror bias and prejudgment of guilt deprived [Appellant] of a fair trial.

V. Whether introduction of ancient convictions to impeach a defense witness was prejudicial error.

VI. Whether denying application of the Castle Doctrine to [Appellant] using deadly force in self-defense from an Aggressor with deadly weaponry while occupying his vehicle was erroneous.

VII. Whether the exclusion of evidence regarding a witness' mental health condition was reversible error.

VIII. Whether introduction of gruesome and inflammatory autopsy photographs lacking probative value was prejudicial error.

IX. Whether the denial of severance of charges unduly prejudiced Mr. Stiver.

X. Whether the denial of judgment notwithstanding the verdict was error where the evidence was insufficient to establish guilt of murder to shock one's conscience requiring reversal.

Brief for Appellant at 8-9.

This Court reviews each of Appellant's issues under the following standards of review:

Appellant's first issue challenges the trial court's decision not to appoint him an expert although he was an indigent defendant. In criminal matters, our standard of review of challenges related to the appointment of an expert witness for the defense is as follows:

The provision of public funds to hire experts to assist in the defense against criminal charges is a decision vested in the sound discretion of the [trial] court and a denial[,] thereof[,] will not be reversed absent an abuse of that discretion.

***Commonwealth v. Cannon***, 954 A.2d 1222, 1226 (Pa.Super. 2008), *appeal denied*, 964 A.2d 893 (Pa. 2009). Moreover,

[i]t is well-established that indigent defendants have a right to access the same resources as non-indigent defendants in criminal proceedings. The state has an affirmative duty to furnish indigent defendants the same protections accorded those financially able to obtain them. Procedural due process guarantees that a defendant has the right to present competent evidence in his defense, and the state must ensure that an indigent defendant has fair opportunity to present his defense.

***Commonwealth v. Konias***, 136 A.3d 1014, 1019 (Pa.Super. 2016) (citations and quotation marks omitted), *appeal denied*, 145 A.3d 724 (Pa. 2016). The Commonwealth, however, "is not obligated to pay for the services of an expert simply because a defendant requests one." ***Konias***, 136 A.3d at 1020-1021 (citation omitted). Rather, the defendant must demonstrate "the content and relevancy of the proposed expert testimony before such a request will be granted." ***Commonwealth v. Curnutte***, 871 A.2d 839, 842 (Pa.Super. 2005) (citation omitted). A request for an expert witness, whose necessity is based upon mere speculation as to the assistance the expert will provide to the defense, does not warrant the appropriation of public funds. ***Commonwealth v. Harris***, 703 A.2d 441, 449 (Pa. 1997), *cert. denied*, 525 U.S. 1015 (1998).

Appellant's second, seventh and eighth issues challenge the trial court's evidentiary rulings. The following standard governs this Court's review of the admissibility of evidence:

> Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact.
>
> Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.

*Commonwealth v. Borovichka*, 18 A.3d 1242, 1253 (Pa.Super. 2011) (quoting *Commonwealth v. Levanduski*, 907 A.2d 3, 13–14 (Pa. Super. 2006) (*en banc* ) (internal citations omitted)).

The admission of demonstrative evidence, like a computer-generated animation, requires a trial court to weigh the possible probative value and prejudicial effects of the animation. This is a matter within the discretion of the trial judge which this Court will not overturn absent an abuse of that discretion. **See Commonwealth v. Serge**, 586 Pa. 671, 682, 896 A.2d 1170, 1177 (2006); *Commonwealth v. Ford*, 451 Pa. 81, 301 A.2d 856, 858 (1973).

Furthermore, our Supreme Court has explained that

[w]hen a witness suffers from a mental disability relevant to his or her ability to accurately observe, recall or report events, the jury must be informed of the disability in order to assist it in properly assessing the weight and credibility of the witness's testimony. The evidence can be said to affect credibility when it shows that the witness's mental disorganization impaired his or her capacity to observe an event at the time of its occurrence, to maintain a clear recollection of it, or to communicate the observation accurately and truthfully at trial.

*Commonwealth v. Davido*, 630 Pa. 217, 260, 106 A.3d 611, 637 (2014) (citations omitted).

When considering the admissibility of photographs of a homicide victim, which by their very nature can be quite disturbing, the trial court must engage in a two-step analysis:

First a trial court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

*Commonwealth v. Pruitt*, 597 Pa. 307, 327,951 A.2d 307, 319 (2008) (internal brackets and citation omitted). As the Supreme Court recognized, photographic images of a homicide victim are often relevant to determining the intent element of the crime of first-degree murder. *Id*.

Thirdly, Appellant asserts his due process rights were violated as a result of the Commonwealth's failure to preserve and provide him with certain exculpatory evidence. This issue presents a question of law, for which our standard of review is *de novo* and our scope of review is plenary."

*Commonwealth v. Bagnall*, 235 A.3d 1075, 1084 (Pa.2020). Our Supreme Court summarized the law relevant to the adjudication of such claims as follows:

> The law governing alleged *Brady* violations is well-settled. In *Brady*, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. The Supreme Court subsequently held that the duty to disclose such evidence is applicable even if there has been no request by the accused, and that the duty may encompass impeachment evidence as well as directly exculpatory evidence. Furthermore, the prosecution's *Brady* obligation extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution.
>
> On the question of materiality, the Court has noted that such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Thus, there are three necessary components that demonstrate a violation of the *Brady* strictures: the evidence was favorable to the accused, either because it is exculpatory or because it impeaches; the evidence was suppressed by the prosecution, either willfully or inadvertently; and prejudice ensued.

*Commonwealth v. Lambert*, 584 Pa. 461, 470-71, 884 A.2d 848, 853-54 (2005).

Next, Appellant sets forth a biased juror claim as a result of Juror Number Eleven's statements made at the outset of the last day of trial. In this regard, this Court has stated the following:

"The decision to discharge a juror is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion." **Commonwealth v. Carter**, 537 Pa. 233, 643 A.2d 61, 70 (1994). "This discretion exists **even after the jury has been [e]mpanelled and the juror sworn**." **Id.** (emphasis added). Our Supreme Court explained that "a finding regarding a venireman's impartiality 'is based upon determinations of demeanor and credibility that are peculiarly within a trial [court]'s province. ... [Its] predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record.' " **Smith**, 540 A.2d at 256 (quoting **Wainwright v. Witt**, 469 U.S. 412, 428–29, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). It is the appellant's burden to show that the jury was not impartial. **Commonwealth v. Noel**, 629 Pa. 100, 104 A.3d 1156, 1169 (2014). Further, this Court has found that *per se* prejudice does not result where a juror becomes upset during the trial. **See Commonwealth v. Pander**, 100 A.3d 626, 632 (Pa.Super. 2014) (*en banc* ).

In **Commonwealth v. Briggs**, [608 Pa. 430, 12 A.3d 29 (2011)] our Supreme Court set forth the standard for prospective juror disqualification:

> The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor. ... It must be determined whether any biases or prejudices can be put aside on proper instruction of the court. ... A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice or demonstrates a likelihood of prejudice by his or her conduct or answers to questions.

608 Pa. 430, 12 A.3d 291, 333 (2011) (quoting **Commonwealth v. Cox**, 603 Pa. 223, 983 A.2d 666, 682 (2009)).

While most cases address the issue of prospective jurors, we have employed the same analysis in cases where a question arises about a juror's impartiality during trial. **See Pander**, 100 A.3d at 632 ("While **Hale** and the cases discussed therein involved juror challenges prior to trial, we find the discussion therein apt ...."); **Carter**, 643 A.2d at 70 ("Th[e trial court's] discretion exists

- 10 -

even after the jury has been [e]mpanel[ ]ed and the juror sworn.").

**Commonwealth v. Rush**, 162 A.3d 530, 537–38 (Pa.Super. 2017) (emphasis in original, some brackets added).

In his fifth question, Appellant argues the trial court erred in permitting the Commonwealth to impeach a defense witness with numerous convictions, including burglary and theft, that occurred decades prior to trial. With regard to the impeachment of witnesses for prior offenses, this Court has observed that:

> "[f]or the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict, or by plea of guilty or *nolo contendere*, shall be admitted if it involved dishonesty or false statement." Pa.R.E. 609(a). "Crimes involving dishonesty or false statement [are] commonly referred to as *crimen falsi* crimes." **Commonwealth v. Moser**, 999 A.2d 602, 607 (Pa.Super. 2010). "[C]*rimen falsi* involves the element of falsehood, and includes everything which has a tendency to injuriously affect the administration of justice by the introduction of falsehood and fraud." **Commonwealth v. Jones**, 334 Pa. 321, 323, 5 A.2d 804, 805 (1939).

**Commonwealth v. Davis**, 17 A.3d 390, 395 (Pa.Super. 2011). If the conviction is more than ten years old, it "is admissible only if...its probative value substantially outweighs its prejudicial effect...and the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." Pa.R.E. 609(b).

Next, Appellant posits the trial court erred in failing to allow Appellant to apply the Castle Doctrine to his alleged use of force in self-defense. In this regard, this Court has stated:

When a court instructs the jury, the objective is to explain to the jury how it should approach its task and the factors it should consider in reaching its verdict. In examining jury instructions, our standard of review is to determine whether the trial court committed a clear abuse of discretion or an error of law controlling the outcome of the case. A charge will be found adequate unless the issues are not made clear, the jury was misled by the instructions, or there was an omission from the charge amounting to a fundamental error. Moreover, in reviewing a challenge to a jury instruction, the entire charge is considered, not merely discrete portions thereof. The trial court is free to use its own expressions[,] as long as the concepts at issue are clearly and accurately presented to the jury.

*Commonwealth v. Bradley*, 232 A.3d 747, 759 (Pa.Super. 2020) (internal citations, quotations, and original brackets omitted).

Appellant further claims his charges for Possession with Intent to Deliver and Theft by Unlawful Taking should have been severed from the homicide charges. Our standard of review of the denial of a motion to sever is as follows: "Joinder and severance of separate indictments for trial is a discretionary function of the trial court; consequently, the trial court's decision is subject to review for abuse of that discretion." *Commonwealth v. Brookins*, 10 A.3d 1251, 1255 (Pa.Super. 2010), *appeal denied*, 610 Pa. 625, 22 A.3d 1033 (2011). In addition,

The traditional justification for permissible joinder of offenses or consolidation of indictments appears to be the judicial economy which results from a single trial. The argument against joinder or consolidation is that where a defendant is tried at one trial for several offenses, several kinds of prejudice may occur: (1) [t]he defendant may be confounded in presenting defenses, as where his defense to one charge is inconsistent with his defenses to the others; (2) the jury may use the evidence of one of the offenses to infer a criminal disposition and on the basis of that inference, convict the defendant of the other offenses; and (3) the jury may

- 12 -

cumulate the evidence of the various offenses to find guilt when, if the evidence of each offense had been considered separately, it would not so find.

***Commonwealth v. Janda***, 14 A.3d 147, 155 (Pa.Super. 2011) (quoting

***Commonwealth v. Morris***, 493 Pa. 164, 171, 425 A.2d 715, 718 (1981)).

"Thus[,] in arriving at a meaningful standard to guide the trial court in its exercise of discretion, and to permit appellate courts to determine whether the trial court abused this discretion, we must weigh the possibility of prejudice and injustice caused by the consolidation against the consideration of judicial economy." ***Id.***

Finally, Appellant states that in light of all of the aforesaid, the trial court's failure to grant his motion for Judgment for Acquittal or Judgment Notwithstanding the Verdict constitutes reversible error and the matter should be remanded for a new trial. Specifically, Appellant avers he lacked the requisite mental state to commit murder.[3] We consider this issue mindful of the following:

_____

[3] A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing. 18 Pa.C.S.A. § 2502. Intentional killing is defined as "killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." ***Id.*** To establish the offense of first-degree murder, the Commonwealth must prove, (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. ***Commonwealth v. Padilla***, 80 A.3d 1238, 1244 (Pa. 2013). For first degree murder, a killing is with malice if the perpetrator acts with an intent to kill; "it is the specific intent to kill which distinguishes murder in the first degree from lesser grades of murder." ***Commonwealth v. Simpson***, 754 A.2d 1264, 1269 (Pa. 2000). *(Footnote Continued Next Page)*

- 13 -

A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge.

The standard of review for claims of insufficient evidence is well-settled. With respect to such claims, we consider the evidence in the light most favorable to the Commonwealth as verdict winner. In that light, we decide if the evidence and all reasonable inferences from that evidence are sufficient to establish the elements of the offense beyond a reasonable doubt. We keep in mind that it was for the trier of fact to determine the weight of the evidence and the credibility of witnesses. The jury was free to believe all, part or none of the evidence. This Court may not weigh the evidence or substitute its judgment for that of the factfinder.

*Commonwealth v. Devries*, 112 A.3d 663, 667 (Pa.Super. 2015) (citations omitted). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa.Super. 2014).

We have reviewed the certified record including the transcripts from the five-day jury trial, Appellant's brief, the applicable law, and the ninety-five page, well-reasoned Opinion authored by the Honorable Timothy M. Sullivan of the Blair County Court of Common Pleas and filed on March 26, 2021, pursuant to Pa.R.A.P. 1925(a).

---

"Specific intent to kill can be inferred from the use of a deadly weapon upon a vital part of the victim's body." *See Commonwealth v. Padilla*, 80 A.3d 1238, 1244 (Pa. 2013).

- 14 -

Upon doing so, we conclude that Judge Sullivan's Opinion precisely sets forth the relevant standards of review this Court must employ in analyzing each issue Appellant presents on appeal and meticulously and accurately disposes of each claim mindful of the same. Applying the applicable standards of review set forth above to the trial court's analysis, we discern no abuse of discretion or error of law.

Accordingly, we adopt Judge Sullivan's Opinion as our own and affirm the judgment of sentence on that basis. We direct the parties to attach the trial court's opinion in the event of further proceedings in this matter.

Judgment of sentence affirmed.

Judge Kings joins the memorandum.

Judge Dubow files a concurring memorandum in which Judge King joins and President Judge Emeritus Stevens concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/27/2021

Received 3/26/2021 11:45:27 AM Superior Court Western District

Filed 3/26/2021 11:45:00 AM Superior Court Western District
907 WDA 2020

IN THE SUPERIOR COURT OF PENNSYLVANIA


COMMONWEALTH OF PENNSYLVANIA      :
          APPELLEE      :    SUPERIOR COURT DOCKET
     :    907 WDA 2020
     :
     :
     :    TRIAL COURT DOCKET NO:
     :    CP-07-CR-0001897 – 2018
     :
v.      :
     :
JOHN P. STIVER, II,      :
          APPELLANT      :
     :

HON. TIMOTHY M. SULLIVAN      PRESIDING JUDGE

PETER J. WEEKS, ESQUIRE      DISTRICT ATTORNEY
NICHOLE M. SMITH, ESQUIRE      FIRST ASST. DISTRICT ATTORNEY

KRISTEN L. ANASTASI, ESQUIRE      COUNSEL FOR APPELLANT


***OPINION PURSUANT TO RULE 1925(a) OF THE
PA RULES OF APPELLATE PROCEDURE***


**FACTUAL/PROCEDURAL HISTORY:**


After jury trial held January 27-31, 2020, the Appellant, **John P. Stiver, II**, was

convicted of First Degree Murder and related charges for an incident which occurred

in the Bethany Lutheran Church parking lot within the City of Altoona, Blair County,

PA on Thursday, July 26, 2018. On such date, the Appellant shot and killed the

1

victim, David Hoover. The Co-Affiants were Detective Sergeant Terry Merritts and Patrolman Nathan Snyder of the Altoona Police Department.

A Post Trial Motion was filed on behalf of the Appellant on February 11, 2020 [Reproduced Record #37]. An Amended Post Trial Motion was then filed on February 27, 2020. [R.R. #39]. A hearing was originally scheduled on April 15, 2020; however, due to the Statewide Judicial Emergency and the closure of the courts to the public, an Order was entered on April 2, 2020 [R.R. #42] continuing the matter. The hearing was subsequently held on July 7, 2020 at which time the Appellant presented the testimony of Kimberly A. Benton and her husband, Frank Benton, Jr. After submissions of Memoranda of Law by both the Commonwealth [R.R. #55] and the Appellant, we entered an Opinion and Order dated July 30, 2020 denying and dismissing the Appellant's Amended Post Trial Motions, as well as the Appellant's Petition to Reopen. [R.R. #56]. The matter proceeded to sentencing on July 31, 2020 at which time the Appellant received a life sentence for his conviction of Murder of the First Degree and concurrent sentences relative to his non-merging convictions. [R.R. #59].

On August 26, 2020, the Appellant timely filed a Notice of Appeal to the Superior Court. [R.R. #63]. We entered a Rule 1925(b) Order on August 27, 2020 [R.R. #65] directing the Appellant to file his Concise Statement of Errors Complained of on Appeal within twenty-one days' service of our Rule 1925(b) Order. The Appellant complied, filing his Statement of Matters Complained of on Appeal on September 17, 2020. [R.R. #67]. The Appellant raised fourteen separate alleged errors which will be addressed below.

The Appellant's alleged errors involve issues which have been previously addressed through pretrial and post trial motions and opinions issued by this court. Rather than attach our pretrial and post trial opinions and orders as exhibits to this Rule 1925(a) Opinion, we will incorporate and repeat same herein so that all of the Appellant's alleged errors are addressed in one Opinion.

## MATTERS COMPLAINED OF ON APPEAL:

### 1. Denial of Castle Doctrine Defense.

**Applicable Law:**

Our standard of review in regard to a trial court's decisions on jury instructions is well-settled: "[O]ur standard of review when considering the denial of jury instructions is one of deference-an appellate court will reverse a court's decision only

when it abused its discretion or committed an error of law." ***Commonwealth v. Galvin***, 603 Pa. 625, 651, 985 A.2d 783, 798-99 (2009).

At issue are the following subsections of 18 Pa. C.S. §505:

**(b) Limitations on justifying necessity for use of force**

&ast;  &ast;  &ast;

(2.1) Except as otherwise provided in paragraph (2.2), an actor is presumed to have a reasonable belief that deadly force is immediately necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat if both of the following exist:

(i)   The person against whom the force is used is in the process of unlawfully    and forcefully entering, or has unlawfully and forcefully entered and is present within, a dwelling, residence or occupied vehicle; or the person against whom the force is used is or is attempting to unlawfully and forcefully remove another against that other's will from the dwelling, residence or occupied vehicle.

(ii)  The actor knows or has reason to believe that the unlawful and forceful entry or act is occurring or has occurred.

(2.2)  The presumption set forth in paragraph (2.1) does not apply if:

&ast;  &ast;  &ast;

4

> (iii)  the actor is engaged in a criminal activity or is using the dwelling, residence or occupied vehicle to further a criminal activity.

*      *      *

18 Pa. C.S. §505(b)(2.1), (2.2).

The "castle doctrine" is an evidentiary means by which a defendant may attempt to prove justification by self-defense. The castle doctrine is subject to a similar, initial standard by which courts must assess the appropriateness of a self-defense instruction, namely, that a valid claim of self-defense, or the castle doctrine, must be made out as a matter of law, and this determination must be made by the trial judge. A court does not necessarily assess burdens of proof when considering applicability of a castle doctrine jury instruction, but instead whether there was any evidence to justify the instruction. *Commonwealth v. Cannavo*, 199 A.3d 1282, 1287-1288 (Pa. Super. 2018).

### Discussion:

During the fifth and final day of trial, January 31, 2020, we entertained oral argument from counsel relative to whether we should charge the jury on the castle doctrine. The following constitutes the arguments placed on record by counsel:

> ATTORNEY ANASTASI: Judge, we have argument on the Castle Doctrine. I believe that that would go one step further, meaning, Mr. Stiver would not have the duty to retreat. Castle Doctrine does extend to occupied vehicles. He was in his occupied vehicle at the time. We contend he was not engaged in criminal activity. Criminal activity was defined as either a misdemeanor or a felony at the time. He did not have that. The only thing they do have, the firearm, but he's only charged with a summary, so, that would take that out of the criminal activity portion that the statute requires. If the Commonwealth would argue that the drug deal or the theft is part of the criminal activity to meet that requirement for him to have a duty to retreat, the case law when they're talking about it is it's contemporaneous, like, the person couldn't receive the Castle Doctrine in his house because he had a firearm and he's 6105, he can't possess a firearm. This deal -- the drug deal and the theft occurred three and a half hours prior to the use of force. We believe that that is nowhere close in time in being contemporaneous that the Courts have carved out, I mean, it's very sparse law on this part of the Castle Doctrine but the cases that we do have, it's immediate. What they are doing, having the gun in his hand when he's 6105 and he can't have it, something to that effect but they don't contemplate activity -- criminal activity hours prior to and then, I mean, if it took these guys a week to find him, then he can't use the Castle Doctrine in his house because a week ago, there was a drug deal. So, we would state that the Castle Doctrine does apply, which

6

would permit Mr. Stiver not have to retreat. That's all. Thank you.

BY THE COURT: Attorney Anastasi, thank you. Attorney Weeks.

ATTORNEY WEEKS: Thank you, Your Honor. Your Honor, I would initially point out that Attorney Anastasi has advanced no evidence in this case that Mr. Hoover was attempting to enter the vehicle of the defendant. That is a requirement of the Castle Doctrine. Not even Dillion Bryan advanced any claim that the decedent was attempting to enter. Dillion Bryan did testify that he believed Mr. Hoover was striking the car multiple times with a bat; never said anything about an attempt to enter the vehicle. For that reason and that reason alone, the Castle Doctrine would not be available in this case. Even assuming arguendo that some witness had been produced by Attorney Anastasi that claimed the decedent was trying to enter the vehicle, this defendant is involved in criminal activity in numerous ways. Initially, he illegally has possession of a firearm that's loaded in his vehicle. That is for Your Honor to determine. He has, I submit, we have shown evidence that he had controlled substances in his pocket. More pertinently, we have shown evidence that he had controlled substances in the center console of his vehicle atop his expired photo ID with the blue straw. Both of those are misdemeanors in this Commonwealth, as was the charge of paraphernalia. This is not a paraphernalia case. This is not a possession case. That still applies, though, when Your Honor is evaluating whether this defendant can avail himself of the Castle Doctrine. And, finally, Attorney Anastasi has suggested numerous times over the course of the pendency of this litigation that the drug deal and theft from Sheetz has no bearing on what happened in the church parking lot. Your Honor, that is the causation of this homicide. Mr. Hoover and Mr. Adams are trying to find the defendant and Mr. Clemens because the defendant and Mr. Clemens are charged with stealing $250 from them. Mr. Hoover and Mr. Adams met with Mr. Clemens and Mr. Stiver at Sheetz where drugs were exchanged and more money was exchanged with the promise of drugs. That is directly on point to what happened and, in fact, the testimony, I submit, from both sides is clear that once the lightbulb goes off in

7

Mr. Hoover's head that they're not coming back with the cocaine that I ordered, he begins immediately both pursuing them and calling everyone that he can think of to try to locate where they are. So, to argue that that criminal conduct has no bearing on whether the Castle Doctrine applies, I submit, is not a realistic argument. However, I don't think Your Honor needs to get that far because, again, there has to be some evidence of record, some claim even that the decedent was trying to enter the vehicle and, here, we just don't have that. So, as a matter of law, this is not one of the cases where the Castle Doctrine would apply because we don't have an attempt by the decedent to enter the vehicle. If for some reason Your Honor finds that that is not fatal to the Castle Doctrine applying, there are numerous ways this defendant was engaged in criminal activity that should bar him from being able to seek refuge under the Castle Doctrine. I would ask that the jury -- that not only Your Honor find that the Castle Doctrine does not apply but that Your Honor indicate to the jury -- because the Castle Doctrine is something that people throughout the Commonwealth -- not just lawyers but everyday citizens are very aware of the Castle Doctrine. The Castle Doctrine simply does not apply in this case because of this defendant's bad behavior and because of that, I would ask the jury to be instructed that the Castle Doctrine does not apply.

[R.R. #46, 1/31/20 Transcript, pp. 62-66].

We denied the Appellant's request for jury instruction relative to the

castle doctrine and stated on the record the following:

> BY THE COURT: We'll note again we're back on the record in the Commonwealth of Pennsylvania vs. John Stiver, II, CR 1897-2018. I'd note we're in the presence of counsel and Mr. Stiver outside the presence of the jury. So, I'll just read this into the record: We agree with the Commonwealth that the Castle Doctrine does not apply under 18 Pa. C.S. Section 505(b), the limitation section, specifically, 2.1. There is no evidence that David Hoover unlawfully and forcefully entered the defendant's vehicle or attempted to do so or that he tried to remove the defendant

8

from his vehicle. At no time did anyone ever testify that David Hoover entered or tried to enter the defendant's vehicle. At most, there was testimony that David Hoover walked around the back of the defendant's vehicle and along the passenger side and may have struck the vehicle in the back with his bat. Further, under 2.2, the presumption that an actor had a reasonable belief that deadly force is immediately necessary to protect himself against death or serious bodily injury does not apply if, under subsection 3(i), the actor [is] engaged in criminal activity or is using the occupied vehicle to further criminal activity. In this case, there is evidence pertaining to the prior drug transaction that occurred at the Sheetz store. The alleged theft of $250, possession of drug paraphernalia and possession of a controlled substance on both the defendant's person and in the console of his car. Therefore, we find as a matter of law that the defendant is not entitled to an instruction on the Castle Doctrine. We will note an objection of record by the defendant to the Court's ruling.

[R.R. #46, 1/31/20 T., pp. 72-73].

Thus, we submit that the facts evinced at trial did not justify an instruction on the castle doctrine, and we assert that this alleged error lacks merit.

2. **Denial of Motion for Mistrial.**

In his Amended Post-Trial Motion filed February 24, 2020 [R.R. #39], the Appellant sought a mistrial for an alleged *Brady* violation, claiming that the police withheld exculpatory evidence of a video-tape depicting the decedent with a deadly weapon. This issue was addressed in our Opinion and Order dated July 30, 2020 [R.R. #56], which we incorporate and re-state herein.

9

***Applicable Law:***

The law governing alleged ***Brady*** violations is well-settled. [***Brady v. Maryland,*** 373 U.S. 83, 83 S.Ct. 1194 (1963)]. In ***Brady,*** the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." ***Brady,*** 373 U.S. at 87, 83 S.Ct. at 1196-1197.

Furthermore, the prosecution's obligation extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution. ***Kyles v. Whitley,*** 514 U.S. 419, 437-438, 115 S.Ct. 1555, 1567-1568, 131 L.Ed.2d 490 (1995); ***Commonwealth v. Burke,*** 566 Pa. 402, 413, 781 A.2d 1136, 1142 (2001).

On the question of materiality, the court has noted that "[s]uch evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' The materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. "Rather, the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as

to undermine confidence in the verdict.'" Thus, there are three necessary components that demonstrate a violation of the *Brady* strictures: the evidence was favorable to the accused, either because it is exculpatory or because it impeaches; the evidence was suppressed by the prosecution, either willfully or inadvertently; and prejudice ensued." *Commonwealth v. Burke, supra.*, 781 A.2d at 1141 (internal citations omitted).

### Discussion:

In his Amended Motion [R.R. #39], the Appellant alleged that on or about July 26, 2018 (date of incident), the Altoona Police Department entered the residence of Frank & Kimberly Benton to view surveillance footage from the security cameras mounted on their home. The Appellant claimed that such surveillance footage revealed evidence favorable to the defense and that "the police deliberately and consciously decided not to collect the surveillance tape nor did they request preservation of the same . . ." [¶3 of Amended Post Trial Motion]. The Appellant further alleged that the Benton video tape depicted the decedent (David Hoover) . . . "advancing on the Defendant with a deadly weapon in conformance with the Defendant's Justification defense." [¶3].

11

The Appellant asserted that the police failed to document within any incident reports that they entered the Benton residence or viewed the Benton video-tape [¶4]; that the Commonwealth failed to provide any report of the police meeting with Ms. Benton or inform defense counsel of the exculpatory video contents [¶6] and that such video "would have shown the aggressor's mannerisms, mood and tone." [¶7].

The Appellant also asserted that the Benton video tape constituted mandatory discovery, i.e., evidence that was "favorable to the accused that is material either to guilt or to punishment including information that tends to exculpate the defendant, to mitigate the level of the defendant's culpability, to support a potential defense, or that tends to impeach a prosecution of witnesses' credibility," pursuant to Pa.R.Crim.P. 573. [¶10]. As a result, the Appellant asserted a *Brady* violation.

In support of his post trial motion, the Appellant presented the testimony of Kimberly A. Benton and her husband, Frank Benton, Jr., during our July 7, 2020 hearing. Mr. & Mrs. Benton reside at 208 4th Avenue, Altoona, PA 16602, in close proximately to the Bethany Lutheran Church parking lot where the subject incident took place. [R.R. #48, 7/7/20, T., p. 1]. During her testimony, Mrs. Benton confirmed that they had surveillance cameras installed at their home and that such video will tape over itself after 90 days. [R. R. #48, 7/7/20, T., p. 3]. She confirmed that any

12

video related to the July 26, 2018 incident has been taped over. The Benton's have three separate video cameras, one facing Second Street, one facing Fourth Avenue and one facing the back of their home. [R.R. #48, 7/7/20, T., p. 4]. After learning of the shooting, Mrs. Benton personally watched the video, and it was her recollection that she saw a white vehicle driving up Second Street and then parking. [R.R. #48, 7/7/20, T., p. 4]. She recalls seeing a man get out of this vehicle, going to the trunk, and taking something out. She was unable to specifically identify the item being removed from the trunk. She did describe it as a "large object" and stated that she assumed it was a baseball bat since there are children that often play baseball in the nearby lot. [R.R. #48, 7/7/20, T., p. 5]. She acknowledged that after retrieving this item, the male went to his right at an angle and that she was unable to observe anything else on the video. [R.R. #48, 7/7/20, T., p. 5]. She testified that when the man got the item out of the trunk, he initially held it up, but as he was walking, he was holding it down to his side. [R.R. #48, 7/7/20, T., pp. 11-12]. She also did not observe any other adult individuals. She confirmed that there is no audio on their surveillance tapes. [R.R. #48, 7/7/20, T., pp. 5-6].

13

Mrs. Benton confirmed that Altoona Police Officers came to their residence, although she recalled that only one officer came into their home. [R.R. #48, 7/7/20, T., p. 6]. She indicated that this was approximately 1 hour after the shooting. [R.R. #48, 7/7/20, T., p. 9]. Mrs. Benton confirmed that no police officer ever asked her to retain the tape or requested a copy of the tape, or to preserve the tape. [R.R. #48,7/7/20, T., pp. 10-11].

On cross-examination, Mrs. Benton acknowledged that Detective Shane Strobel came to their home in May of 2020 and inquired about placement of their surveillance cameras and the angles of same. [R.R. #48, 7/7/20, T., p. 13]. Certain slides were presented during our hearing which she confirmed showed the various angles from their three cameras. Slide No. 2, wherein the camera faced Fourth Avenue and toward First Street, showed her front porch. [R.R. #48, 7/7/20, T., p. 13]. She acknowledged that one cannot see the Bethany Church parking lot as the camera was mounted. [R.R. #48, 7/7/20, T., p. 14]. She confirmed the position of this camera is the same today as it was on July 26, 2018. [R.R. #48, 7/7/20, T., p. 14]. She also acknowledged that Slide No. 3, involving the camera facing the backyard and the alley way between Fourth and Fifth Avenue, does not allow one to see the parking lot or Bethany Church at all. [R.R. #48, 7/7/20, T., p. 14]. As to Slide No. 4,

14

facing Fourth Avenue, Mrs. Benton acknowledged that the church parking lot is in the upper corner and that you cannot see the entire parking lot. She also admitted that the view is obstructed by her own front porch, a pole and a house across the street. She acknowledged that you cannot see the wall of the Bethany Church, nor the alley that runs between the church and the parking lot. [R.R. #48, 7/7/20, T., pp. 14-16].

Mrs. Benton confirmed that she never told anyone, including defense counsel, that the item retrieved from the white vehicle's trunk was a handgun. [R.R. #48, 7/7/20, T., p. 19]. She also admitted that she never showed defense counsel these various camera angles, nor that the video would have showed the victim acting aggressively. [R.R. #48, 7/7/20, T., pp. 20-21]. She acknowledged that she saw the white vehicle go down Fourth Avenue and turn up Second Street. She did not know where the vehicle may have turned around. She could not see where the vehicle went. [R.R. #48, 7/7/20, T., p. 22]. Mrs. Benton confirmed that she did not know the identity of the police officer who came to the residence and further acknowledged that at no time did she ever provide the video to the Altoona Police Department. [R.R. #48, 7/7/20, T., pp. 27-28]. Finally, she confirmed that Slide No. 5, which was video footage taken from a neighbor's residence (Christopher Irvin), showed more of the

church parking lot than any of her videos. She also agreed that Mr. Irvin's video had audio. [R.R. #48, 7/7/20, T., pp. 28-29].

During our July 7, 2020 hearing, Frank Benton, Jr. also testified. He is Kimberly's wife and confirmed the location of the three surveillance cameras mounted on their home. On the date of incident, he recalled a police officer walking up and down the block asking if anyone had video surveillance. [R.R. #48, 7/7/20, T., p. 30]. He told police that he did, and a police officer came into his home and watched the video. Mr. Benton, who also watched the video, recalled seeing a white car go down Fourth Avenue, come to a stop sign, take a right on Second Street and then come back down, parking in between two trees at the edge of the parking lot. He recalled seeing a male get out of the driver's seat and retrieve something out of the trunk. He was carrying this item beside him and went off on an angle across the church parking lot. [R.R. #48, 7/7/20, T., pp. 30-32]. Mr. Benton asked the officer if he needed a copy of the video, to which he claimed the officer advised that he would be back in touch with him if he needed the video for evidence. Mr. Benton confirmed that he never heard from anyone from the Altoona Police Department, nor did he meet with anyone involving the case prior to trial. [R.R. #48, 7/7/20, T., p. 33].

On cross-examination, it was Mr. Benton's belief that he observed the white car turn around and park before the shooting and that it would surprise him if the testimony at trial revealed that the white car turned around after the shooting. [R. R. #48, 7/7/20, T., p. 35]. Mr. Benton admitted that Slide No. 5, which was the video tape from Christopher Irvin's home, showed a larger portion of the church parking lot than any of the Benton videos. [RR. #48, 7/7/20, T., p. 36]. He recalled speaking to a female police officer on the day of the shooting and providing certain information regarding the video. [R.R. #48, 7/7/20, T., pp. 36-37]. Mr. Benton identified the white vehicle in Slide No. 20 as being the vehicle he observed when watching the video tape. [R.R. #48, 7/7/20, T., p. 39]. He recalled watching the video two to three times, but acknowledged that it has been approximately two years ago since he last watched it. [R.R. #48, 7/7/20, T., p. 40]. He recalled seeing Lieutenant Ashley Day traversing the street after the shooting, but Lieutenant Day did not come into their home. Instead, Lieutenant Day went into Mr. Irvin's home. [R.R. #48, 7/7/20, T., pp. 40-41]. Mr. Benton indicated that the police officer who came into their home was a male [R.R. #48, 7/7/20, T., p. 41]; however, he does not know his name. [R.R. #48, 7/7/20, T., p. 46]. Mr. Benton also testified that he never advised defense counsel that Lieutenant Day came into their home. [R.R. #48, 7/7/20, T., pp. 42-43]. When shown

17

Slide No. 4, Mr. Benton confirmed that it only shows a corner of the parking lot, but that you cannot see the wall of the Bethany Lutheran Church, nor the upper right portion of the parking lot. [R.R. #48, 7/7/20, T., pp. 46-47].

At the conclusion of Mr. Benton's testimony, there were certain stipulations entered of record by counsel; specifically, that the video surveillance tape obtained from Christopher Irvin's home was provided by the Commonwealth to the defense during discovery and that it was corrupted; that Mr. Irvin was making highly inflammatory comments relative to the incident on social media; and that there was a joint decision made by the Commonwealth and the defense not to play Mr. Irvin's video to the jury during the trial. [R.R. #48, 7/7/20, T., pp. 50-52].

In response to the Appellant's post-trial motion, the Commonwealth asserted that at no time did it ever have any video in its possession from Mr. & Mrs. Benton's residence. Additionally, the Commonwealth asserted that it never had any reason to believe that the contents of the video materially differed from the Commonwealth's theory of the case, the physical evidence and the eye witness statements. Further, it pointed out that the Altoona Police Department incident report, page 19, put defense counsel on notice that video surveillance existed at the Benton residence as of July 26, 2018. [R.R. #52].

18

The Commonwealth also asserted that there were several meetings with the defense to review and explain all of the video footage seized during the investigation including the video provided by Sheetz, Marsha Pippetti, William Kuny and Christopher Irvin. [R.R. #52].

The Commonwealth acknowledged that Mrs. Benton did report to the District Attorney's Office for a pretrial interview; however, at no time did she disclose any information that was materially different or inconsistent with the Commonwealth's theory of the case, or any other inculpatory or exculpatory evidence that was not previously provided to the defense. [R.R. #52].

It is important to note that the Commonwealth conceded throughout the trial that the decedent was wielding a baseball bat, including at the time of the shooting.

Based upon the foregoing, we found that the Benton video was never collected and thus, it was never in the possession of the Commonwealth nor the Altoona Police Department. Further, neither Mr. nor Mrs. Benton specifically described the item being retrieved from the white vehicle trunk as being a baseball bat. Significantly, at the time of trial, the Commonwealth's evidence clearly established that the victim, David Hoover, was brandishing a baseball bat, even possibly striking the blue Ford Fusion vehicle in which the Appellant and Dillion Bryan were passengers. The evidence

19

presented by the Commonwealth demonstrated the aggressive behavior by the victim. The computer generated animation (CGA) also clearly showed that Mr. Hoover was holding a baseball bat during the subject incident. [R.R.#56].

Our analysis of the above led to several conclusions. The Benton video tapes were never in the possession of the Blair County District Attorney's Office nor the Altoona Police Department. Mr. & Mrs. Benton's testimony confirmed as much. The fact that the Bentons had video footage from their home was disclosed to defense counsel during discovery. Neither Mr. nor Mrs. Benton specifically described the item being retrieved from the trunk of the white vehicle by an unknown male as a baseball bat. At most, Mrs. Benton described it as a "large object", which she assumed was a baseball bat. At no time did Mr. or Mrs. Benton observe any other adult individual in their video footage. Their observations were limited and of short duration. Their video did not capture what occurred in the parking lot between David Hoover and the Appellant. Even if one would assume that the item retrieved from the trunk of the white vehicle was a bat, such is merely cumulative of the substantial evidence presented to the jury during trial that Mr. Hoover had a bat in his possession. The Commonwealth acknowledged and took ownership of the fact that on the date in question, its victim (David Hoover) had a bat in his hands during the confrontation

20

with the Appellant in the church parking lot. We found absolutely no evidence of bad faith nor the withholding of material evidence by the Commonwealth nor the Altoona Police Department. We did not find that presentation of this limited evidence contained within the Benton video(s) would have resulted in a different outcome for the Appellant, nor in any way called into question the veracity of the jury's verdict. [R.R. #56].

Thus, we submit that the Appellant's alleged error lacks merit.

### 3. *Denial of Motion to Reopen.*

### *Discussion:*

Based upon the same rationale set forth in No. 2 above, we denied the Appellant's Motion to Reopen in our Opinion and Order dated July 30, 2020 [R.R. #56] (which we incorporate herein). Further, the Appellant presented no statutory authority nor case law supporting his request that the court should have "reopened" the record after jury verdict.

### 4. *Denial to Remove Juror.*

This issue was addressed in our Opinion and Order dated July 30, 2020 [R.R. #56], which we incorporate and re-state herein:

21

*Applicable Law:*

The decision to discharge a juror is within the sound discretion of the trial court, even after the jury has been empaneled and sworn, and will not be disturbed in the absence of an abuse of that discretion. *Commonwealth v. Smith*, 206 A.3d 551, 562 (Pa. Super. 2019). When there is no evidence to support the trial court's decision to remove a juror, the court has abused its discretion. *Bruckshaw v. Frankford Hosp. of City of Philadelphia*, 58 A.3d 102, 111 (Pa. 2012).

*Discussion:*

In his amended post-trial motion [R.R. #39], the Appellant argued that a certain Juror demonstrated bias and should have been removed from the panel. The court tipstave, Lou Kensinger, brought to our attention a conversation she had with Juror #11 after court concluded on Thursday, January 30, 2020. Once this was brought to the court's attention, we directed our tipstaves to segregate Juror #11 when she reported to court the morning of Friday, January 31, 2020, which they did. Juror #11 was kept in the lawyer's lobby away from all other jurors. In the presence of counsel and the Appellant, but outside the presence of the jury, Ms. Kensinger was sworn and described what happened the evening before. [ R.R. #46, 1/31/20, T., pp. 7-11]. We

22

then called Juror #11 to testify as to her conversation with the tipstave. Juror #11 did confirm that she had a conversation with Ms. Kensinger and expressed frustration with the defense witness, Dillion Bryan. She expressed frustration that Dillion Bryan could not identify the Appellant in court, when he was with him in the car on the day of the shooting. [R.R. #46, 1/31/20, T., p. 11]. She also personally felt that he was "higher than a kite". [R.R. #46, 1/31/20, T., pp. 12 and 15]. She admitted that she did not find Mr. Bryan to be a credible witness. However, Juror #11 also confirmed that she had not prejudged the case [R.R. #46, 1/31/20, T., p. 16]; that she could still afford the Appellant his presumption of innocence and that she would hold the Commonwealth to its burden of proving each element of the crimes charged beyond a reasonable doubt. [R.R. #46, 1/31/20, T., pp. 17-18]. She also indicated that there were still questions that she had in her own mind. [R.R. #46, 1/31/20, T., p. 18]. (Quite frankly, we found this specific testimony to be favorable to the defense). We heard arguments from counsel and then denied Attorney Anastasi's motion to strike for cause. [R.R. #46, 1/31/20, T., pp. 20-23]. In doing so, we were satisfied, based upon Juror #11's responses to the court and counsels' questions under oath, as well as our observations of her demeanor, that she was being honest and sincere relative to her testimony that she remained a fair and impartial juror.

23

We also note that Juror #11 was wise enough to ensure that her discussion with the tipstave, which was elicited by the tipstave, occurred outside the presence of all the other jurors. She did not share her personal feelings about Mr. Bryan as a witness with any other juror. [R.R. #46,1/31/20, T., pp. 12-13]. In further support of our ruling, we, including counsel, questioned the competency of Mr. Bryan when he was called as a defense witness. In fact, we conducted an on-the-record colloquy, outside the presence of the jury, to ensure his competency to testify. [R.R. #45, 1/30/20, T., pp. 176-182]. After such colloquy, we found him competent to testify. Attorney Weeks indicated that Mr. Bryan "gave one of the most bizarre testimonies" he has ever witnessed. [R.R. #46, 1/31/20, T., p. 21]. If this were a trial by court, we would not have found Mr. Bryan to be a credible witness by any stretch of the imagination. We firmly believe that no fair, objective and impartial juror would have found Mr. Bryan's testimony to be credible. His testimony was not supported by any other evidence in the case.

We believe our decision in this case is supported by a recent Superior Court decision in *Commonwealth v. Marrero*, 217 A.3d 888 (Pa. Super. 2019). In *Marrero*, a juror made a comment during the course of a conversation amongst jurors regarding the concept of facing trial before a jury of one's peers, stating that none of

24

the jurors was a peer of the defendant. Although the defendant took the juror's comment as referring to his Latino heritage, when questioned by the court about this comment, the juror said she was referring to the fact that she was older than the defendant. The court believed the juror's testimony that she had not involved race and would deliberate fairly and impartially. 217 A.3d at 892.

In the case at bar, Juror #11 made a comment during her colloquy with the court and counsel that "I don't deal well with millennial snot-nosed kids and he didn't even know where he was . . . I had a meltdown over it because I personally feel he was higher than a kite . . ." [R.R. #46, 1/31/20, T., pp. 11-12]. There are a few factors in our situation even more favorable than what existed in *Marrero*. Here, Juror #11's comments were about a particular witness, not the Appellant. Further, her comments were made privately to a single tipstave (after the tipstave invited the conversation) and did not occur in the presence of any other juror. Juror #11 did not share her personal thoughts regarding Mr. Bryan with any other juror.

Therefore, we found no fault in Juror #11 reaching the conclusion that Mr. Bryan was not a credible witness upon the conclusion of his testimony. Such is human nature. The most important factors in our determination were that Juror #11 could still afford the Appellant his presumption of innocence; that she would hold the

25

Commonwealth to its burden of proof; that she had not prejudged the Appellant's guilt; and that she was and could remain fair and impartial. We found her testimony in all these respects to be honest and entirely credible.

5.    **_Introduction of Evidence of Conviction._**

The Appellant claims that we committed error in allowing the Commonwealth to impeach defense witness, Kenneth Lafferty, by a 40 year old conviction.

**_Applicable Law:_**

"[E]vidence of prior convictions can be introduced for the purpose of impeaching the credibility of a witness if the conviction was for an offense involving dishonesty or false statement, and the date of the conviction or the last day of confinement is within ten years of the trial date. If a period greater than ten years has expired the presiding judge must determine whether the value of the evidence substantially outweighs its prejudicial effect." **_Commonwealth v. Randall_**, 515 Pa. 410, 415, 528 A.2d 1326, 1329 (1987).

In order to determine whether the value of a remote _crimen falsi_ conviction substantially outweighs its prejudicial effect, the court looks to 5 factors. Those factors include: "(1) the degree to which the commission of the prior offense reflects upon

26

the veracity of the defendant-witness; (2) the likelihood, in view of the nature and extent of the prior record, that it would have a greater tendency to smear the character of the defendant and suggest a propensity to commit the crime for which he stands charged, rather than provide a legitimate reason for discrediting him as an untruthful person; (3) the age and circumstances of the defendant; (4) the strength of the prosecution's case and the prosecution's need to resort to this evidence as compared with the availability to the defense of other witnesses through which its version of the events surrounding the incident can be presented; and (5) the existence of alternative means of attacking the defendant's credibility." *Id.* at 1328.

"It is only when the *crimen falsi* conviction is more than ten years old…that evidence of the conviction becomes conditioned on the probative value of the evidence substantially outweighing its potential prejudicial effect." *Commonwealth v. Hoover*, 630 Pa. 599, 612-13, 107 A.3d 723, 730-31 (2014), citing Pa. R.E. 609(b)(1). This determination is within the discretion of the trial court using the 5 factors listed in *Randall* as a guide in that discretionary determination. *Id.*

[T]he decision to admit or exclude evidence is committed to the trial court's sound discretion and its evidentiary rulings will only be reversed upon a showing that it abused that discretion." *Commonwealth v. Laird*, 605 Pa. 137, 168, 988 A.2d 618,

636 (2010). "[T]he Superior Court may reverse an evidentiary ruling only upon a showing that the trial court abused that discretion. A determination that a trial court abused its discretion in making an evidentiary ruling "may not be made 'merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such a lack of support so as to be clearly erroneous." *Commonwealth v. Hoover, supra.*, 107 A.3d at 729 (quoting *Commonwealth v. Sherwood*, 603 Pa. 92, 982 A.2d 483, 495 (2009)).

***Discussion:***

On January 30, 2020, the fourth day of trial, the defense called Kenneth R. Lafferty as a witness [R.R. #45, 1/30/20, T., pp. 156-175]. During his testimony, Mr. Lafferty stated, *inter alia,* that he was friends with the victim, David Hoover, that they spoke on the phone all the time and that Mr. Hoover came to his house "almost every day." [R.R. #45, 1/30/20, T., p. 157].

Mr. Lafferty testified that on the date of incident (July 26, 2018), that he received 5 or 6 phone calls from Mr. Hoover. He said that Mr. Hoover asked if Eddie ("Cowboy" Clemens) was with him and then told him "that Eddie had ripped his friend off and he was looking for him . . .". Mr. Hoover explained that the incident was

28

about drugs.  Mr. Lafferty further testified: " . . . he [Hoover] talked about going and finding him and stuff and then he said well my friend has a gun and I said let your friend deal with it.  He said my friend has a gun and he said he's going to kill him." [R.R. #45, 1/30/20, T., pp. 157-158].  Mr. Lafferty testified that Mr. Hoover was "upset" and confirmed that he was mad.  [R.R. #45, 1/30/20 T., p. 158].  He also stated that these phone calls occurred between 3:00-5:00 p.m. [R.R. #45, 1/30/20, T., pp. 158-159].

When it came time for the Commonwealth to cross-examine Mr. Lafferty, the following exchange occurred on the record at sidebar:

> BY ATTORNEY WEEKS:   Your Honor, I believe the Commonwealth's objection to the witness's testimony is on record.   Because of the distance in time the Commonwealth was just able to run the witness's criminal history.  We were not aware Attorney Anastasi was calling this witness.  As she had indicated before, she was calling a different witness first.  I immediately upon receiving the name and date of birth of the witness we did ask our office to run it.  They did.  This individual has numerous theft [convictions].  They are outside the ten year lookback. We are asking Your Honor to allow us to impeach him with that information.  We believe it would be appropriate in this case for the following reasons.  One, he and he alone has this evidence of this phone call.   Attorney Anastasi waived her opportunity to ask Mark Adams about the phone call and the veracity of this witness will -- the jury's determination of this witness's veracity is going to determine basically this entire case now because this witness is testifying that the decedent threatened to kill the defendant and his associate over a phone call that he didn't report to the police from almost two years.  So we believe it's –

29

BY ATTORNEY SMITH: It was never reported to the police so we're clear.

BY ATTORNEY WEEKS: Yeah, he's never reported it to the police but only reported it to Attorney Anastasi after being approached by the defendant's family on Tuesday.

BY THE COURT: Attorney Anastasi, your response.

BY ATTORNEY ANASTASI: It's completely inappropriate to put in his record. It's past the ten year lookback. Like they're saying I haven't seen it but it's past ten years and there's been no -- just because it's a surprise witness, even though I have given proffers on him twice, it's still not enough to introduce some old record.

BY ATTORNEY WEEKS: Your Honor, I apologize for interrupting but the witness has been proffered twice but in the last hour and a half or two hours and the Court can employ a balancing test after ten years to decide whether the prejudicial effect outweighs the probative value. Here I submit the probative value is extremely high.

BY THE COURT: Counsel, what I'm going to do is I'm going to grant the Commonwealth's motion. Obviously beyond that ten year period is within the Court's discretion. Because of the unique circumstances of this particular witness, the unique circumstances in his testimony and the fact that there was late disclosure I'll grant the Commonwealth's request. You can impeach him by crimen falsi beyond the ten years.

[R.R. #45, 1/30/20 T., pp. 164-165].

There were numerous *crimen falsi* convictions for Mr. Lafferty, including a 1976 theft by unlawful taking; a 1986 theft of property and receiving stolen property; and a 2000 theft by unlawful taking and receiving stolen property. [R.R. # 45, 1/30/20 T., pp. 165-167].

30

In rebuttal, the Commonwealth called Detective Randy Feathers of the D.A.'s Office, who testified as to Mr. Lafferty's prior convictions based upon his review of the NCIC federal data base. [RR. #46, 1/31/20 T., pp. 41-43]. Detective Feathers confirmed that Mr. Lafferty had prior convictions in 1976 for theft by unlawful taking, in 1986 for theft by deception and receiving stolen property; and in 2000 for theft by unlawful taking and receiving stolen property, all occurring in Pennsylvania. [R.R. #46, 1/31/20, T., pp. 43-44, Com. Ex. 39].

Detective Feathers also confirmed that there was a 1975 conviction in the State of Florida for burglary; and finally, a 2012 conviction in Maryland for theft of less than $100. [R.R. #46, 1/31/20, T., p. 46].

It is important to point out that this impeachment by prior *crimen falsi* convictions was of a defense witness, not the Appellant himself. In applying the 5-factor test set forth in **Randall** above, as it may be relevant to a witness, we find:

(1) *the degree to which the commission of the prior offense(s) reflects upon the veracity of the [witness]:* Here, there were five (5) different *crimen falsi* convictions occurring over a 37-year time frame in three different states. Clearly, the number, time period and different locations could call the witness' veracity into question in the minds of the jurors.

31

(2) *the likelihood, in view of the nature and extent of the prior record, that it would have a greater tendency to smear the character of the defendant and suggest a propensity to commit the crime for which he stands charged, rather than provide a legitimate reason for discrediting him as an untruthful person:* There is no evidence that the Appellant was involved or even knew Mr. Lafferty at the time of any of his prior *crimen falsi* convictions. In fact, the Appellant was not born until September 25,1984, well after the 1975 and 1976 convictions. He would have been two years old at the time of Mr. Lafferty's 1986 conviction, and 14 years old at the time of the 2000 conviction. Thus, Mr. Lafferty's prior convictions in no way smeared the character of the Appellant nor in any way suggested a propensity to commit the crimes for which he was charged. The sole purpose for which the prior *crimen falsi* convictions were utilized was to impeach the credibility of Mr. Lafferty.

(3)    *the age and circumstances of the defendant:*  As set forth above, the Appellant was thirty-five (35) years old as of the time of trial.

(4)    *the strength of the prosecution's case and the prosecution's need to resort to this evidence as compared with the availability to the defense of other witnesses through which its version of the events surrounding the incident can be presented:*  As the Commonwealth argued at side-bar and as set forth above, Mr. Lafferty was the only witness who testified that Mr. Hoover and his associate had a gun and threatened to kill the Appellant.  Mr. Lafferty claimed this threat occurred just a few hours before the shooting. During a phone call on the date of incident, Mr. Lafferty described Mr. Hoover as being upset and mad.  Mr. Lafferty never reported this phone call to law enforcement.

Other than calling into question the lack of disclosure to the police and Mr. Lafferty's friendship with the Appellant's parents [R.R. #45, T., p. 170-171], there was no other direct avenue for the Commonwealth to impeach Mr. Lafferty's credibility as a witness, other than to introduce his prior *crimen falsi* convictions. The defense presented other witnesses (Dillion Bryan and Tina Paullin) to support the Appellant's version of the events.  Mr. Bryan testified to the events surrounding the shooting in the parking lot in support of the Appellant's self-defense claim.   The direct

33

impeachment evidence for Mr. Lafferty was critical for the Commonwealth in meeting its burden of refuting the Appellant's self-defense claim.

(5)     *the existence of alternative means of attacking the witness' credibility:* This has been addressed above.

Therefore, at trial, we concluded that the probative value of the evidence of Mr. Lafferty's prior *crimen falsi* convictions substantially outweighed it potential prejudicial effect, and permitted the Commonwealth to impeach him thereby.

We would also note that in our closing instructions, we provided the jury the Suggested Standard Instruction 4.08D-Impeachment – Prior Conviction (Witness Only), as follows:

> You also heard evidence that Ken Lafferty, a witness called by the defense, had been convicted of prior crimes of *crimen falsi.* The only purpose for which you may consider evidence of these prior convictions is in deciding whether or not to believe all or part of the testimony of Mr. Lafferty. In doing so, you may consider the type of crimes committed, how long ago they were committed and how it may affect the likelihood that Mr. Lafferty testified truthfully in this case.

[R.R. #46, 1/31/20, T., pp. 176-177].

As a result of the foregoing, we submit that this alleged error lacks merit.

## 6. *Denial of Motion for Court-Appointed Medical Expert.*

## 7. *Denial of Motion for Court-Appointed Firearms and Ballistics, Force Science, Self-Defense and Shooting Scene Reconstruction Expert.*

## 8. *Denial of Motion for Court-Appointed Investigator.*

We submit that there is overlap relative to these alleged errors, therefore, they will be addressed collectively below. We also addressed these issues pre-trial in our Opinions and Orders entered April 29, 2019 [R.R. #11] & July 9, 2019 [R.R. #15], which we incorporate herein.

### *Applicable Law:*

"There is no constitutional mandate, either federal or state, that experts be appointed at public expense to assist in the preparation of a defense whenever requested by one accused of a crime." *Commonwealth v. Gelormo,* 327 Pa. Super. 219, 229, 475 A.2d 765, 770 (Pa. Super.1984). "Under the law of Pennsylvania...the appointment of an expert witness or an investigator to assist in the preparation of a defense is vested in the sound discretion of the trial court." *Id.* at 769. "[T]he trial court will not be found to have abused its discretion in the absence of a clear showing as to the content, relevancy and materiality of the testimony of the potential witnesses." *Commonwealth v. Bell*, 706 A.2d 855, 862 (Pa. Super. 1998).

35

*Discussion:*

We initially addressed the Appellant's motion for experts in our Opinion and Order of April 29, 2019 after hearing held April 2, 2019, wherein we denied the Appellant's motion without prejudice to the filing of a more detailed motion identifying the name and professional address of the proposed expert; the specific field of expertise; the fee schedule and retainer being sought by such expert for review of all relevant records and issuance of an expert report; and the anticipated time and fees required if the expert would be needed to testify at trial. We also denied the Appellant's motion for appointment of an investigator without prejudice to file a supplemental motion providing more detailed information similar to the above [R.R., #11, 4/29/19 Opinion, pp. 17-18].

The Appellant filed a Supplemental Omnibus Pretrial Motion, which included a Motion for Appointment of a Medical Expert, Firearm and Ballistics, Force Science, Self-Defense and Shooting Scene Reconstruction Expert as well as a Motion for Appointment of Investigator. We held a hearing on June 18, 2019 to address the various pre-trial motions.

36

During the hearing, Attorney Anastasi identified Mr. Mickey McComb as a firearms and ballistics expert. His curriculum vitae and fee schedule was admitted into the record. [R.R. #41, 6/18/19 T., p. 5].

The Appellant also testified during our June 18, 2019 hearing. The Appellant testified as to his financial situation. He acknowledged that he hired Attorney Anastasi in her private capacity and that she was paid a $15,000 retainer. [R.R. #41, 6/18/19 T., pp. 6-9].

During the June 18, 2019 hearing, we requested Attorney Anastasi to place on the record why she believed that the defense needed its own court-appointed forensic pathologist. The following was her response:

> BY THE COURT: Okay, Attorney Anastasi, what I would like you to do, if you could, if you could supplement the record and tell me why you believe that you need - - I understand that Mr. Stiver and as far as his financial circumstances, but if you could establish for the record please why you believe that the defense needs the Court to appoint these particular experts in some detail.
>
> Attorney Anastasi: Okay. Your Honor, for the medical expert first, the forensic pathologist, the Commonwealth is their essential theory of the case is that Mr. Hoover was shot while attempting to turn and run away. I have spoken to the pathologist that we would like as an expert and that is even where the shot went into, that is sheer speculation. That just because the head may have been turned one way or another, they cannot pinpoint it is because of oh I saw a gun and I am going to turn to run. More than oh there was a fly on me and so I turned my head. He was still shot in the front in the neck. His own,

37

Mr. Hoover's own, friend that was in the vehicle had never said that he was turning his [head] or turned his body to run away. So we would need the forensic pathologist to - - him really more than anyone else to rebut the Commonwealth's pathologist saying that where he was shot in the neck that to make the connection and the correlation that that meant that he was turning his head because he saw a gun and he was retreating with his deadly weapon.

BY THE COURT: Attorney Anastasi, let me ask you this. If the Court did not grant your request to appoint the medical expert, would that in any way preclude you from making those same arguments or raising those same issues in cross-examination of the Commonwealth's expert and/or in closing arguments to the jury?

ATTORNEY ANASTASI: Which we would do alternatively. I don't know - - I haven't spoken to the Commonwealth's pathologist, but if we don't get the expert we would be crossing him on that.

BY THE COURT: I guess what I really want to ensure is that if the Court denies your request for a court-appointed medical expert, what prejudice do you believe that you would have, Mr. Stiver would have relative to his defense at the time of trial?

ATTORNEY ANASTASI: Well, if their expert is getting up and saying that the decedent was retreating at the time that he was being shot, we believe that us not having the expert we are at a disadvantage of not having another pair of eyes look at this to say that just because - - the head turns, the neck doesn't. Just because the head was turned one way to make the correlation it is because he saw a gun and he was going to turn to run. That is why we would be at the disadvantage by not having our own expert say that that is sheer speculation that you can just because of where he was shot. I mean Mr. Stiver is sitting in a vehicle with his arm out the window shooting. You know, it is not going to be a perfect shot.

BY THE COURT: And you have had the opportunity to review the Commonwealth's pathologist expert report?

38

ATTORNEY ANASTASI: Mh-hm.

BY THE COURT: Yes?

ATTORNEY ANASTASI: Yes.

BY THE COURT: Okay, and does the Commonwealth pathologist make any indication in his report as to whether - - I mean is there any dispute that Mr. Stiver was sitting in his vehicle at the time [the decedent] was shot?

ATTORNEY ANASTASI: No, I don't believe that the Commonwealth has any dispute about that.

BY THE COURT: Okay.

ATTORNEY ANASTASI: The pathologist does say in his report of greatest significance is where he was shot with what was exposed the other side would have had to be turned, but to make the leap that is because of him seeing a gun.

BY THE COURT: Do you expect your expert to dispute the location of where the bullet entered the victim?

ATTORNEY ANASTASI: I do not.

BY THE COURT: The arguments then that you are making do you believe as Mr. Stiver's attorney you could make those same arguments to the jury again, to the jury cross-examination - - I am sorry - - to the expert in cross-examination to the jury at the time of closing argument?

ATTORNEY ANASTASI: I could, Judge, but I mean I am stuck with the witnesses answer and, if he says he was the head was turned because he saw a gun and he was running. I mean however ludicrous that would sound to make, I'm still stuck with his answer.

BY THE COURT: If the Court allows that answer.

ATTORNEY ANASTASI: Right, which we would - -

39

BY THE COURT: Object to.

ATTORNEY ANASTASI: Yes, but there would be a motion in limine too that whole questioning.

BY THE COURT: Okay, Attorney Anastasi, anything else you want to place on the record relative to the forensic pathologist expert?

ATTORNEY ANASTASI: Your Honor, I would just say that he would be the expert that we would of greatest importance I guess in this case.

[R.R. #41, 6/18/19 T., pp. 16-20].


We then asked Attorney Anastasi to establish the need for a court-appointed

firearms and ballistics expert. The following exchange took place:

> BY THE COURT: Okay, and then Attorney Anastasi turning to the firearms and ballistic expert. If you could establish on the record the defense need for that particular expert?
>
> ATTORNEY ANASTASI: Your Honor, this case really does come down to use of force and deadly force that if it was justified and things about the weapon, and that is why [we] would be seeking the expert that we are looking for of course does the reconstruction, but he also looks into self-defense for science. I really don't think this would be much of a ballistic case, but definitely the use of force with what is at issue in this case is why we would be asking for that.
>
> BY THE COURT: And do you anticipate that being the primary defense [,] self-defense in this case?
>
> ATTORNEY ANASTASI: Yes, Judge, yes.
>
> BY THE COURT: Okay, Attorney Anastasi, anything else that you want to add to the record relative to the firearms ballistic expert [force] science experts?

40

ATTORNEY ANASTASI: No, Your Honor.

We then heard from District Attorney Weeks, who stated:

ATTORNEY WEEKS: Judge, dealing with the first of the issue of the pathologist, I would like to read the cause of death cited to [by] the forensic pathologist in the report provided by the Commonwealth to Attorney Anastasi. "Mr. Hoover was struck by a single shotgun wound which injured structures within the face, neck and upper region of the right chest. Of greatest significance is complete transection of the right carotid artery and perforation of the right subclavian artery with copious associated hemorrhage. Alignment of the various wound tracks and abrasion margins place and muzzle of the weapon on the [decedent's] left side and the decedent's head turned to the left." I see nowhere any of the items [that] Attorney Anastasi raise as a basis for procuring an expert report in the field of the forensic pathologist as to the cause and manner of death. The Commonwealth's theory of the case relative to the position of Mr. Hoover depends, Your Honor, on the positon of the defendant's car, the position which I submit and I have shared this with Attorney Anastasi I can extrapolate through where the shotgun shell pellets were found or recovered from items in the parking lot, particularly, a signpost from the defendant's statement, and other individual statements as to where the defendant was when he [fired] the fatal shot. Nowhere does this forensic pathologist say that Mr. Hoover was going forward or going backward or turning around. He would not be able to say that. Now what he can be asked by both parties are hypothetical questions which I would fully intend to ask him and Attorney Anastasi can cross-examine him on that. But essentially, the way I see it, your Honor, is Attorney Anastasi is asking for roughly $10,000 of taxpayer money to have a report that says exactly what this report says. That he was shot on the left side of his neck. I don't believe that there is any way to dispute that. The issue for trial and for the jury is could Mr. Hoover been shot on the left side of his neck with his head turned to the left if he was advancing on Mr. Stiver. That is of no moment for the forensic pathologist. That is a combination of the pathological report in the autopsy,

41

the reconstruction of the scene, where evidence was found at the scene, and where the shooter places himself at the same. All of those factors together are going to paint that picture not the cause and manner death. So if there is no dispute to the cause and manner of death, I don't see any basis for this expert certainly not an expert that would be funded entirely by tax dollars to the tune of what looks like might be up around $10,000. Moving to the use of force expert, your Honor, I would first argue that this use of force expert appears that I have only had a moment to look at his C.V., but he appears to be a force expert like most use of force experts. A person who trains police and other law-enforcement on when to use deadly force and [when] not to use deadly force, and what kind of force to use and what kind of situation. All of that is out the window in this case because the defendant is not a law-enforcement officer who is acting within his or her capacity as a law enforcement officer when he took David Hoover's life. Simply put, Your Honor, most of the background that use of force expert has in the instruction and training that they have given and received don't apply to his case. Even more pressing, I would submit, is that this petition to hire use of force expert I believe is not yet ripe. We have not yet got to the stage of pretrial motions, but I would submit that we will where the Court determines whether this defendant has at his utility self-defense or the Castle Doctrine. I submit, he clearly does not and will not be afforded the Castle Doctrine and the jury should not be instructed that it is even an option for them to consider. This defendant was in commission of multiple crimes. He was in unlawful possession of a firearm he used to take Mr. Hoover's life. He had controlled substances within his vehicle. He had just committed a sale of controlled substances hours earlier to the decedent and was involved in stealing two hundred dollars from the decedent with the promise [of] the sale of cocaine when he and his co-conspirator had no intention of selling cocaine. For all of those factors, Your Honor, there is no way that this defendant could avail himself of the Castle Doctrine. I believe the *Commonwealth versus Cannavo* C A N N A V O and I have a cite here for the Court, 199 A.3rd 1282 and it was decided on December 3rd, 2018. In that Court it was a felon not to possess who shot someone and attempted to use the Castle Doctrine to say hey I did not

42

have the duty to retreat in my own home because of the Castle Doctrine. The Court ruled that he could not use it because he was a person not to use a firearm. I cite that for two reasons. One, that individual is in unlawful possession of a firearm. Mr. Stiver was in unlawful possession of his firearm under the circumstances of his case and by his own admission. Two, and more importantly, that case is clear that it is the Court's decision as to whether the Doctrine can be applied or considered by the jury not something that has to be given to the jury for them to decide legally if it applies. So the Commonwealth's argument in this case will be that Mr. Stiver cannot receive the Castle Doctrine instruction because he was in commission of in fact a multitude of crimes prior to and during his slaying of Mr. Hoover. As far as justification goes, I believe my review of the law anyone can raise justification for the crime of first-degree murder. I do not believe that Mr. Stiver can raise the crime of justification for third-degree murder or any of the lesser degrees of homicide or aggravated assault whether it be serious bodily injury or bodily injury with a deadly weapon. I would cite for the Court I believe it is 18 P.S. 503B. It is justification generally choice of evils. Essentially what it says is when the actor here that would be Mr. Stiver was reckless or negligent in bringing about the situation requiring a choice of harm or evils or appraising the necessary - - necessity, excuse me, for his conduct, the justification afforded by this section is unavailable in a prosecution for any offense from which recklessness or negligence as the case may be suffices to establish culpability. Reckless conduct is an element of third-degree murder and certainly an element of both aggravated assaults. So in this case, the Commonwealth will be arguing that not only can this defendant not avail himself [of] the Castle Doctrine which if he could would mean that he did not have a duty to retreat. And the Commonwealth believes that it can and will establish that he had a duty to retreat from someone who is on foot with a baseball bat when he was in a car that was not encumbered by anything else in a parking lot that was open. But secondarily, that this defendant cannot say for the crimes of third-degree murder the lesser murderers or aggravated assault any degree that he was justified or that it was a shooting in self-defense because he was

most certainly engaged in reckless and negligent conduct that brought about this situation. It was him and his co-conspirator that sold drugs. It was him and his co-conspirator that said that they would get two hundred dollars['] worth of cocaine for David Hoover after they took his money. It was him and his co-conspirator that fled throughout the city without seeking any intervention by law-enforcement. And it was this defendant but by his own admission returned to his home to retrieve a shotgun which he loaded and placed in his car. So, Your Honor, for those reasons I don't believe it would be appropriate to appoint a use of force expert. One, because the [force] signs that dealt with by the expert seems to be law-enforcement use of force. Two, because when everything comes down to it at least the Commonwealth's [argument] is going to be pretrial that Mr. Stiver [can't] avail himself of those defenses. Thank you, Your Honor.

[R.R. #41, 6/18/19 T., pp. 20-26].

After oral argument, we entered an Opinion and Order dated July 9, 2019 [R.R. #15] which we incorporate and re-state below.

### Motion for Appointment of Medical Expert:

### Applicable Law:

The decision of whether to appoint an expert witness to assist in preparation of the defense is within the sound discretion of the trial court. *Commonwealth v. Curnette*, 871 A.2d 839 (Pa. Super. 2005). Indigent defendants have a right to access the same resources as non-indigent defendants in criminal proceedings, and state cannot discriminate against defendants on basis of their indigency.

44

*Commonwealth v. Franklin*, 823 A.2d 906, 909 (Pa. Super. 2003).

State has an affirmative duty to furnish indigent defendants the same protections accorded to those financially able to obtain them. *Commonwealth v. Sweeney*, 533 A.2d 473, 480 (Pa. Super. 1987). Procedural due process guarantees that the defendant has a right to present competent evidence in his defense, and state must ensure that indigent defendant has a fair opportunity to present his defense. *Ake v. Oklahoma*, 470 U.S. 68, 76, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

It is true that the Commonwealth is not obligated to pay for the services of an expert simply because a defendant requests one. *Commonwealth v. Carter,* 643 A.2d 61, 73 (Pa. 1994). There must be some showing as to the content and relevancy of the proposed expert testimony before such a request will be granted. *Commonwealth v. Bell*, 706 A.2d 855, 862 (Pa. Super. 1998).

The Appellant seeks that the court appoint a medical expert, more specifically, an expert in forensic pathology, and has identified Dr. Michael W. Johnson of Allentown, PA as the potential defense

expert. At the time of our hearing, Dr. Johnson's Curriculum Vitae and Fee Schedule, which were attached to the Supplemental Omnibus Pretrial Motion, were incorporated into the record. [R.R. #41, 6/18/19 Hearing Transcript, p. 5]. According to his fee schedule, Dr. Johnson is seeking a retainer of $750.00 and will charge $375.00 per hour.

The Appellant testified during our June 18, 2019 hearing. He has been incarcerated in the Blair County Prison since July, 2018. [R.R. #41, 6/18/19 T., p. 11]. At the present time, he testified that he has no sources of income nor any money in his jail account. He testified that he has no bank accounts of any nature [R.R. #41, 6/18/19 T., p. 7], nor any financial holdings such as a certificates of deposit, stocks, bonds, etc. [R.R. #41, 6/18/19 T., p. 15]. He has no interest in any real estate. [R.R. #41, 6/18/19 T., p. 14]. He does not receive any government subsidies. [R.R. #41, 6/18/19 T., p. 7]. He was last employed in mid-2017 in a part-time landscaping job, wherein he indicates that he was paid $9.00 per hour. The Appellant testified that he held that job for approximately 3 months until he was

46

the victim of a dog bite [R.R. #41, 6/18/19 T., pp. 10-11] and suffered serious injuries. [R.R. #41, 6/18/19 T., pp. 7-8]. He indicated that he filed a civil lawsuit, but has not received any financial settlement. [R.R. #41, 6/18/19 T., pp. 8 & 15]. It is his understanding that such lawsuit has been dismissed. [R.R. #41, 6/18/19 T., pp. 14-15].

The Appellant owns two vehicles, a 2012 Ford Fusion, which he said has an approximate value of $10,000 and is paid for. That vehicle is currently in the possession of the Altoona Police Department. He also owns a 2001 Chevrolet Silverado, which he claims has no value since the engine "blew up". [R.R. #41, 6/18/19 T., pp. 12-14].

The Appellant has hired Attorney Kristen Anastasi as private counsel. Pursuant to his fee agreement, $15,000 was paid to his legal counsel. It is his understanding that such retainer will cover all aspects of legal representation relative to this case. [R.R. #41, 6/18/19 T., pp. 8-10]. Mr. Stiver testified that the retainer was actually paid by his father. What was interesting relative to the Appellant's testimony in this regard is that he was not sure of the spelling of his

47

father's first name, nor whether his father is currently retired [R.R. #41, 6/18/19 T., pp. 11-12], thus calling into the question the Appellant's credibility relative to his alleged indigency and the true source of the payment of the retainer to private counsel.

During our June 18, 2019 hearing, Attorney Anastasi acknowledged that the defense is not questioning the cause nor manner of death, nor are they questioning the location of the bullet entry into the victim's body. [R.R. #41, 6/18/19 T., p. 19]. Defense counsel expressed a concern as to whether the Commonwealth's medical expert may opine that the victim was retreating at the time the Appellant shot him and/or that the victim's head was turned in a particular direction. [R.R. #41, 6/18/19 T., pp. 16-18].

At the time of hearing, Attorney Weeks read into the record the conclusion of the Commonwealth's pathologist as to the cause and manner of death. [R.R. #41, 6/18/19 T., p. 21]. The Commonwealth's forensic pathologist stated in his report: "Mr. Hoover was struck by a single shotgun wound which injured structures within the face, neck and upper region of the right chest. Of greatest significance is

48

complete transection of the right carotid artery and perforation of the right subclavian artery with copious associated hemorrhage. Alignment of the various wound tracks and abrasion margins place [the] muzzle of the weapon on the decedent's left side and the decedent's head turned to the left." [R.R. #41, 6/18/19 T., p. 21]. There is no indication by the Commonwealth's expert in his report as to whether the victim was going forward, turning around, etc. [R.R. #41, 6/18/19 T., pp. 21-22). Attorney Weeks also noted that the theory of the Commonwealth's case relative to the position of the victim depends, at least in part, on the position of the Appellant's car. There were shotgun shells found in the parking lot area around the Appellant's car. [R.R. #41, 6/18/19 T., pp. 21-22].

Therefore, with there being no challenge to the cause and manner of death opined by the Commonwealth's medical expert, we find that the Defendant has not established a need for this court to appoint a defense medical expert. His motion with respect thereto is **denied and dismissed.** (emphasis in original).

[R.R. #15, Opinion and Order dated July 9, 2019, pp. 3-7].

49

### Motion for Appointment of Firearm & Ballistics, Force Science, Self-Defense & Shooting Scene Reconstruction Expert:

Attorney Anastasi indicated that at the time of trial, the Appellant will assert that he was acting in self-defense and/or that his actions were justified. [R.R. #41, 6/18/19 T., p. 20]. Thus, they desire the court to appoint an expert witness to support this defense. The potential defense expert is seeking a non-[refundable] retainer of $1,500. Per his fee schedule, he will charge $150 per hour, but $200 per hour to prepare a written report. His court appearance fee is $450 for three hours. [R.R. #41, 6/18/19 Defendant's Exhibit 2, T., p. 5; R.R. #14]. The Commonwealth objects, noting that the prior experience of the Appellant's potential expert, Mickey McComb, based upon his Curriculum Vitae [R.R. #41, 6/18/19 Defendant's Exhibit 1, T., p. 5; R.R. #14], is training police and other law enforcement officers on when to use deadly force and the appropriate level of such force dependent upon the circumstances. The Commonwealth asserts that such prior training/experience would not be relevant to this case. [R. R. #41, 6/18/19 T., pp. 22-23]. Further, the Commonwealth asserts that the "Castle Doctrine" is not applicable

under the factual scenario involved in this case. [R.R. #41, 6/18/19 T., pp. 23-24].

The Defendant has raised the probability that at the time of trial, he will raise the defense of self-defense/justification and/or the "Castle Doctrine".

"Self-defense" is codified under 18 Pa. C.S. §505(a), which reads as follows:

> **(a) Use of force justifiable for protection of the person.** The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

§505(b) sets forth a number of limitations on the use of self-defense. At the time of trial, before self-defense may be at issue, there must be some evidence from whatever source to justify a finding of self-defense. *Commonwealth v. Bailey*, 471 A.2d 551, 553 (Pa. Super. 1984). A jury charge on self-defense must be given upon request where the jury would have a possible basis for finding self-defense. If there is evidence presented that could support a claim of self-defense, it is up to the fact-finder to pass upon its credibility and,

51

therefore, it is improper for a trial court to exclude such consideration by refusing a charge thereon. *Id.* (internal citations omitted).

The defense of "justification" is codified in 18 Pa. C.S. §503, which reads as follows:

**(a) General rule.** - Conduct which the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable if:

(1) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged;

(2) neither this title nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and

(3) a legislative purpose to exclude the justification claimed does not otherwise plainly appear.

**(b) Choice of evils.** - Where the actor was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity for his conduct, the justification afforded by this section is unavailable in a prosecution for any offense for which recklessness or negligence, as the case may be, suffices to establish culpability.

The case of **Commonwealth v. McClendon**, 874 A.2d 1223 (Pa. Super. 2005) provides us further guidance on the principles of self-defense and justification. In **McClendon**, the defendant was convicted of aggravated assault, violations of the Uniform Firearms Act, and possession of instrument of crime. On appeal, the Pennsylvania Superior Court affirmed. During the trial, the defendant argued that he acted in self-defense. The **McClendon** court stated that where an accused raises the defense of self-defense, the burden is on the Commonwealth to prove beyond a reasonable doubt that the accused's act was not justifiable self-defense, and the Commonwealth sustains this burden if it establishes at least one of the following: (1) the accused did not reasonably believe that he was in danger of death or serious bodily injury or; (2) the accused provoked or continued the use of force or; (3) the accused had a duty to retreat and the retreat was possible with complete safety. **Id.** at 1229-1230. When the accused raises the defense of self-defense, it is within the province of the jury to determine whether the accused's belief that he was in danger of death or serious

53

bodily injury was reasonable, whether he was free of provocation, and whether he had no duty to retreat. *Id.* (internal citation omitted).

Further, the *McClendon* court held that the self-defense/justification instruction stating that the justification rule will not apply if the defendant was negligent or reckless in bringing about the situation requiring a choice of harms or evils was proper; the instruction informed the jury that a defendant's recklessly bringing about the difficulty which raised the necessity of his self-defense conduct would defeat his defense of justification. *Id.* at 1233. The self defense/justification instruction which permitted the jury to negate self-defense if it found that the defendant recklessly brought about or caused his rivals to fire their guns at defendant was a case-specific instruction and was tantamount to the standard self-defense charge's prohibition against provocation or continuation of the difficulty, and thus, the instruction was adequate. *Id.*

Turning to the "castle doctrine", such doctrine is subject to a similar, initial standard by which courts must assess the appropriateness of a self-defense instruction, namely, that a valid claim of self-defense, or

the castle doctrine, must be made out as a matter of law, and this determination must be made by the trial judge. The "castle doctrine' is an evidentiary means by which a defendant may attempt to prove justification by self-defense. *Commonwealth v. Cannovo*, 199 A.3d 1282, 1287 (Pa. Super. 2018). (internal citations omitted).

Potentially at issue in the case before us are the following subsections of 18 Pa. C.S. §505:

**(b) Limitations on justifying for use of force**

*       *       *

(2.1) Except as otherwise provided in paragraph (2.2), an actor is presumed to have a reasonable belief that deadly force is immediately necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat if both of the following conditions exist:

(i) The person against whom the force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered and is present within, a dwelling, residence or occupied vehicle; or the person against whom the force is used is or is attempting to unlawfully and forcefully remove another against that other's will from the dwelling, residence or occupied vehicle.

(ii)    The actor knows or has reason to believe that the unlawful and forceful entry or act is occurring or has occurred.

(2.2)    The presumption set forth in paragraph (2.1) does not apply if:

*    *    *

(iii)    the actor is engaged in a criminal activity or is using the dwelling, residence or occupied vehicle to further a criminal activity; or

*    *    *

18 Pa. C.S. §505(b)(2.1), (2.2).

Therefore, we have set forth the principles of self-defense/justification and the castle doctrine above. Our ruling herein denying the Defendant's request for a court-appointed expert witness in no way precludes the Defendant from asserting a self defense/justification defense at the time of trial. Thus, we find no prejudice to him.

As to whether we actually charge the jury on self defense/justification and/or the castle doctrine, we will **defer** any decision relative thereto until after admission of the evidence during trial and prior to closing arguments. (emphasis in original).

56

Our "final" pre-trial ruling was set forth in our January 13, 2020 Order [R.R. #30],

wherein we held, pertinent to this particular issue:

\*    \*    \*

5. The Defendant's request for a Medical Expert, a Firearms Expert and its own CGA Expert is denied. Relative to a CGA expert, the Defendant has been provided the opportunity to submit evidence deemed favorable to his defense to the CGA expert, Officer Gibson, to re-create a CGA, at the *Commonwealth's expense*.

As to a Medical Expert and Firearms Expert, all discovery in this matter was provided by the Commonwealth to Attorney Anastasi by <u>November 19, 2018</u>. The Commonwealth's pathologist report and autopsy report have been in Attorney Anastasi's possession for greater than one (1) year. We do not agree with the Defendant's assertion that the Commonwealth's CGA somehow constitutes "new evidence". The Commonwealth's CGA was created based upon documentation provided in discovery (e.g., witness statements; the Defendant's statements; photographs; the pathology report; etc.).

The jury selection and jury trial dates were established in our Order of September 19, 2019. The Defendant's renewed request for these expert witnesses is untimely. Attorney Anastasi asserts, in her Petition, that "[b]ecause of the Commonwealth's submission of their CGA imminent to trial the undersigned must neglect general trial preparation time to adequately prepare the CGA . . . leaving the undersigned in the untenable position of having to prepare the case at the same time as trying it." [Petition for Continuance, ¶8]. The record does not support that assertion. Attorney Anastasi has been involved in this case from its inception, being originally hired as private counsel. We have held several status conferences and pre-trial hearings. She has been in possession of the Commonwealth's discovery for over one (1) year. She has been aware of the trial dates for over three (3) months. The information that the Commonwealth provided the CGA expert to create the church parking lot animation derived from evidentiary material exchanged in discovery. Likewise, the evidentiary material that the defense would like to utilize in the creation of its version of the CGA has been in the possession of

57

Attorney Anastasi for more than one (1) year. During our prior status conferences and pre-trial hearings, Attorney Anastasi has demonstrated that she is very familiar with the evidentiary material exchanged in discovery. Thus, we have no doubt that she can (and already has) identify evidentiary material that she believes is favorable to the defense and provide same to Officer Gibson.

Finally, we believe it is critical to quote from our prior Opinion and Order dated July 9, 2019 (which we incorporate herein), when we addressed the Defendant's initial request to appoint a Medical Expert, more specifically, an expert in forensic pathology, in the person of Dr. Michael W. Johnson of Allentown, PA:

> During our June 18, 2019 hearing, Attorney Anastasi acknowledged that the defense is not questioning the cause nor manner of death, nor are they questioning the location of the bullet entry into the victim's body. [T., p. 19]. Defense counsel expressed a concern as to whether the Commonwealth's medical expert may opine that the victim was retreating at the time the Defendant shot him and/or that the victim's head was turned in a particular direction. [T., pp. 16-18].

> At the time of hearing, Attorney Weeks read into the record the conclusion of the Commonwealth's pathologist as to the cause and manner of death. [T., p. 21]. The Commonwealth's forensic pathologist stated in his report: "Mr. Hoover was struck by a single shotgun wound which injured structures within the face, neck and upper region of the right chest. Of greatest significance is complete transection of the right carotid artery and perforation of the right subclavian artery with copious associated hemorrhage. Alignment of the various wound tracks and abrasion margins place [the] muzzle of the weapon on the decedent's left side and the decedent's head turned to the left." [T., p. 21]. There is no indication by the Commonwealth's expert in his report as to whether the victim was going forward, turning around, etc. [T., pp. 21-22). Attorney Weeks also noted that the theory of the Commonwealth's case relative to the position of the victim depends, at

58

least in part, on the position of the Defendant's car. There were shotgun shells found in the parking lot area around the Defendant's car. [T., pp. 21-22].

Therefore, with there being no challenge to the cause and manner of death opined by the Commonwealth's medical expert, we find that that the Defendant has not established a need for this court to appoint a defense medical expert. His motion with respect thereto is denied and dismissed.

[July 9, 2019 Opinion and Order, pp. 6-7]

\* \* \*

[R.R. #30, Order of 1/13/20, pp. 3-7].

Ultimately, we did not charge the jury on the Castle Doctrine, but permitted the Appellant to present his self-defense theory to the jury, which they rejected.

In summary fashion, we did not find that the Appellant ever established a need for the court to appoint the expert witnesses and investigator he sought. The defense never established with any specificity the content, relevancy and materiality of any proposed expert's proffered testimony. The defense did not dispute the cause and manner of death of the victim. Upon his arrest, the Appellant provided a statement to police admitting that he shot and killed David Hoover in the Bethany Lutheran Church parking lot. His claim was that he acted in self-defense. His self-defense theory was presented to the jury and rejected.

Finally, relative to the appointment of an investigator, the defense was provided all discovery well in advance of trial. The defense has not set forth any potential witness that they were unable to meet with or contact due to a lack of an investigator, nor how they were prejudiced thereby.

We submit that each of these alleged errors lack merit.

9.    *Introduction of Computer-Generated Animation.*

The Commonwealth put the Court and defense on notice in the early stages of pre-trial proceedings of its intent to utilize computer-generated animation (CGA) in its case-in-chief. We conducted hearing on January 6, 2020 and then entered an Opinion and Order dated January 7, 2020 initially denying the Commonwealth's request. [R.R. #27]. The Commonwealth filed a Motion to Reconsider on January 8, 2020. We scheduled further hearing on the motion and, thereafter, issued an Opinion and Order dated January 9, 2020, wherein we granted the Commonwealth's Motion to Reconsider, allowing presentation of the CGA during trial. [R.R. #28]. In our Order with Opinion entered January 9, 2020, we stated the following:

> AND NOW, this 9th day of January, 2020, after oral argument held this date, it is hereby **ORDERED, DIRECTED and DECREED** that the Commonwealth's Motion to Reconsider is **granted.** Therefore, the Commonwealth shall be permitted to present the computer generated animation (CGA) prepared by Officer Jeremy Gibson during its case-in-chief. During the trial and prior to the presentation of the CGA, and once again

60

during our closing charge to the jury, we will provide a cautionary instruction to the jury, consistent with what was set forth in the case of *Commonwealth v. Serge*, 896 A.2d 1170, 1186-1187 (Pa. 2006).

In our prior Opinion and Order entered January 7, 2020, we specifically found that the Commonwealth met the first two prongs set forth in *Serge, supra.,* i.e., that the CGA was properly authenticated through the testimony of Officer Gibson; and that it was relevant, as it clearly, concisely and accurately depicts the Commonwealth's theory of the case. We are satisfied that the CGA will aid the jury in the comprehension of the collective testimonies of the witnesses without use of extraneous graphics or information. See *Serge*, 896 A.2d at 1182.

What this court found problematic was the third prong, i.e., whether its probative value was outweighed by its prejudice. In entering our Opinion and Order dated January 7, 2020, we found that this third prong was not satisfied by the Commonwealth. Such concern was based upon the economic disparity between the Commonwealth and the Defendant, as well as a prior request by the Defendant to receive court funds to procure a shooting scene reconstruction expert. In its Motion to Reconsider, and as set forth during our hearing, the Commonwealth pointed out that the Defendant's original pretrial motion requested two (2) experts, including a "firearm, ballistics, force science, self-defense and shooting scene reconstruction expert". Later, the Defendant, in a supplemental pretrial motion, specifically identified Emanuel Kapelsohn to be the court-appointed expert in the field of Firearm and Ballistics, Force Science, Deadly Force, Self-Defense Use of Force and Shooting Scene Reconstruction. This expert was proffered as an expert in the operation and use of firearms. As the Commonwealth acknowledged, Mr. Kapelsohn is eminently qualified in these areas, based upon review of his Curriculum Vitae. There was, however, no proffer of this expert's qualifications or experience relative to crime scene re-creation, reconstruction, re-enactment, or more specifically (as it pertains to our case), crime scene animation. Upon review of Mr. Kapelsohn's C.V., we agree with the Commonwealth that this expert is not qualified to produce a CGA or other animation of the crime scene. Further, at no

61

time, either in writing or during any prior court proceedings, did the defense ever request that an expert be appointed to undertake a CGA until the January 6, 2020 hearing, and only after the Commonwealth's presentation of its own CGA through our evidentiary hearing.

Therefore, and importantly for our decision hereunder, the Commonwealth has raised a substantial question as to the validity of the basis for our original decision.

The Commonwealth has asserted that the CGA is a vital piece of demonstrative evidence and that without same, it will be handicapped from effectively presenting its case to the jury. The Commonwealth states that the positions and movements of both parties during the shooting constantly changed and that there is no reasonable way for the Commonwealth to accurately demonstrate the fluidity of the Defendant and the decedent's positions based upon verbal descriptions alone. Further, the positions of the Defendant and decedent are instrumental in meeting the Commonwealth's burden to dispute an anticipated self-defense claim. The Commonwealth claims that the CGA is its "best evidence" to demonstrate the trajectory of the gunshot (the victim was struck from the right with his head turned to the left), the distance of the gunshot (10 to 25 feet), and the location of the decedent when he was struck (Evidence marker 5) to support its theory of the case, i.e., that the Defendant was not acting in self-defense and had two clear paths to retreat.

During our hearing held this date, the Commonwealth presented two possible remedies to address the court's concern. We find each to be fair and equitable. The first is that the Commonwealth's expert, Officer Gibson, is willing to create a CGA based upon the Defendant's theory as to what occurred in the church parking lot on the date in question, so long as the information provided is based upon matters exchanged in discovery (e.g., the Defendant's statements, witness statements, photographs, pathology report, etc.). It is our understanding that the measurements taken within the church parking lot, where the shooting occurred, are not disputed. The Commonwealth acknowledged that two potential areas where the defense could seek a recreation of the CGA is the angle of the trajectory of the shot, as well as

the position of the Defendant. Therefore, if the Defendant desires Officer Gibson to recreate a CGA based upon the defense theory as to what occurred in the church parking lot, Attorney Anastasi shall make immediate and direct contact with Officer Gibson to provide the information to be utilized in the creation of the CGA for potential use by the Defendant, so long as such information is factually possible based upon the discovery exchanged to date. Attorney Anastasi shall contact Officer Gibson and provide such pertinent information <u>no later than close of business (4:00 p.m.) on Friday, January 10, 2020</u>. The parties shall fully cooperate in the identification and production of such information/documentation to Officer Gibson. Officer Gibson shall then recreate such CGA as soon as possible thereafter. The admission of the Defendant's CGA shall be subject to the same scrutiny we employed relative to the Commonwealth's CGA, i.e., satisfying the three prong test set forth in *Serge, supra.*

In so ruling, we are satisfied that the remedy offered by the Commonwealth provides the defense an opportunity to have a "fair and equitable playing field".

As the *Serge* court opined: "The law does not, and should not, prohibit proficient professional employment of new technology in the courtroom. This is after all, the twenty-first century. As such, we must turn to the traditional factors considered in determining if a particular CGA is admissible." 896 A.2d at 1178.

In consideration of the above, we do not want to create a precedent that in every case where the Commonwealth desires to present a CGA to the jury, that all a defendant needs to assert is economic disparity and force the trial court to decide between one of two options, either precluding the Commonwealth from use of a CGA, or utilizing significant court funds to appoint the defendant his/her own expert.

A defendant does not have an absolute right to a court appointed [expert]. [See, e.g., *Commonwealth v. Bardo*, 709 A.2d 871 (Pa. 1998)]. The *Serge* court also stated: "Similarly, there can be no obligation to provide the defendant the finances necessary to create a CGA of his or her own". 876 A.2d at 1185. The Commonwealth's offer, in effect,

63

presents an opportunity for the Defendant to create his own CGA in this case.

The Defendant's request for a CGA to be created to include the high speed chase that allegedly occurred prior to the shooting in the church parking lot is denied. The CGA will be limited to the events that occurred in the church parking lot.

[R.R. #28].

During our jury trial, the Commonwealth utilized the CGA during its case-in-chief when it called Mark Adams to testify. Mr. Adams was with the decedent, David Hoover, on the date of the subject incident. During Mr. Adams' testimony, the CGA was utilized as demonstrative evidence to aid the witness in his explanation to the jury as to the identification of his white vehicle and the blue Ford Fusion in which the Appellant and Mr. Bryan were occupants; the movement of those vehicles both immediately prior to and after the shooting, and the movement and position of David Hoover leading up to the point of shooting. [R.R. #47, 1/28/20 T., pp. 76-80].

Before allowing the Commonwealth to show the CGA to the jury, we gave the following cautionary instruction:

> BY THE COURT: Okay. You may be seated. Members of the jury, you're going to hear a reference with Mr. Adams' testimony to computer-generated animation, often referred to as CGA. The parties in a case are permitted to use photographs, drawings and other exhibits to illustrate a point that they are attempting to make in a case. This is what we refer to as demonstrative evidence. We refer to this type of evidence as demonstrative evidence as opposed to

substantive evidence since it is offered merely to demonstrate or illustrate a point rather than as actual proof of that point. With the advent of the digital age, computers are now used to produce this type of demonstrative evidence. At a pre-trial hearing several weeks ago, the Commonwealth presented the testimony of Officer Jeremy Gibson of the State College Police Department. We determined Officer Gibson - - we found Officer Gibson to be an expert witness in computer-generated animation. He testified during this hearing that the computer-generated animation, which will now be shown to you is a fair and accurate illustration as to how this shooting allegedly occurred per the Commonwealth's theory. Officer Gibson described how he produced the three-dimensional drawings with computer software to depict those opinions and, thereafter, transform them onto this DVD to produce moving images, which will be played for you. What you are about to be shown is commonly referred to as a computer-generated exhibit. There are two types of computer-generated exhibits. The first is what we call a simulation and the second is what we refer to as an animation. In a simulation, data is entered into a computer which is pre-programmed to perform certain calculations by applying, for example, the laws of physics, mathematical formulas and other scientific principles in order for the computer itself to draw conclusions and to attempt to re-create an incident. The end product of a simulation represents the computer program's conclusion of what happened and the results of the computer simulation serve as the basis for the testifying expert's opinion of what happened. In contrast, an animation is simply a graphic depiction or illustration that an expert has prepared based upon the information or data provided to him with his computations and analysis. With an animation, the computer does not perform any scientific calculations or develop any opinions as is the case with the simulation. An animation consists of computer-generated drawings, which are assembled frame by frame and when viewed sequentially produce the image of motion, thus, an animation is merely a graphic depiction or illustration or recreation which an expert witness has already devised through the information and data provided to him with his own calculations and analysis. Please understand that

65

what you're about to view is an animation not a simulation. This computer-generated animation is a demonstrative exhibit, not substantive evidence and it is being offered solely as an illustration of the Commonwealth's version of events as recreated by Officer Gibson. You should not confuse art with reality and should not view the animation as a definitive recreation of the actual incident. The series of pictures which have been drawn by the computer and transferred onto the tape for our review are no different from a witness sketching a series of drawings on paper and then fanning those pages to portray moving images of his or opinion. Remember, the demonstrative animation is only as good as the underlying testimony, data, assumptions and opinions that serve as the basis for its images and the computer maxim, garbage in-garbage out applies equally to computer animations. Like all other evidence in this case, you may accept it or reject it, that is, the computer-generated animation in whole or in part. I caution you again that the animation may only be considered for demonstrative purposes only. Always bear in mind that the Commonwealth must still meet its burden of proving all the elements of the offenses charged beyond a reasonable doubt. Thank you.

[R.R. #47, 1/28/20 T., pp. 73-76].

We gave an abbreviated version of the same instruction prior to utilization of

the CGA by Commonwealth expert witness, Dr. Kevin Whaley, as set forth below:

BY THE COURT: Members of the jury, you may recall that I read you cautionary instruction yesterday about the computer-generated animation, often referred to as a CGA. I just want to remind you again that a computer-generated animation is offered to you solely as demonstrative evidence and not substantive evidence, and like all of the other evidence in this case, you may accept it or reject it in whole or in part. I caution you again that the animation may only be considered for demonstrative purposes only and please keep in mind that the Commonwealth must still meet its burden of

proving all the elements of the offenses charged beyond
a reasonable doubt. Thank you.

[R.R. #54, 1/29/20 T., pp. 148-149].

Dr. Whaley utilized the CGA to assist the jurors in understanding his testimony regarding the range of the shot, the position of the decedent including where he was standing when he was shot, and the trajectory or path of the shotgun blast as it hit the decedent.

[R.R.#54, 1/29/20 T., pp. 161-163; 164-166].

Finally, during our closing instructions, we gave the complete cautionary instruction as set forth above. [R.R. #46, 1/31/20 T., pp. 177-178]. Thus, we are satisfied that the Commonwealth satisfied the three prongs set forth in *Serge, supra.* and that the CGA's presentation to the jury during trial greatly assisted the jury in understanding the events surrounding the incident on July 26, 2018. Such demonstrative evidence also helped the jury assess whether Appellant's self-defense claim was valid.

Based upon the foregoing, we submit this alleged error lacks merit.

## 10.    *Denial of Evidence of Mental Health Condition.*

*Applicable Law:*

In general, the competency of a witness to testify is presumed, and the burden of demonstrating incompetency of the witness falls on the party objecting to that witness's competency. *Commonwealth v. Short*, 278 Pa. Super. 581, 586, 420 A.2d 694, 696 (Pa. Super. 1980); *Commonwealth v. Anderson*, 381 Pa. Super. 1, 7, 552 A.2d 1064, 1067 (Pa. Super. 1988). "The competency of a witness to testify is a matter within the sound discretion of the trial judge, whose decision will not be reversed absent a clear abuse of discretion." *Commonwealth v. Trudell*, 371 Pa. Super. 353, 359, 538 A.2d 53, 56 (Pa. Super. 1988), citing *Commonwealth v. Short*, 278 Pa. Super. 581, 420 A.2d 694, 696 (Pa. Super.1980) and *Commonwealth v. Chuck*, 227 Pa. Super. 612, 323 A.2d 123 (Pa. Super. 1974).

The breadth of discretion of the court in determining whether a witness is competent is wide as the trial judge has the opportunity to personally observe and evaluate the demeanor and sincerity of the witness. *Commonwealth v. Trudell*, *supra.*, citing *Commonwealth v. Mangello*, 250 Pa. Super. 202, 206, 378 A.2d 897, 899 (Pa. Super. 1977). When the witness is a sane adult, the court need not even

68

conduct inquiry into competency unless it has some doubt concerning the witness's competency after having observed the witness. *Id.* citing *Commonwealth v. Fulton,* 318 Pa. Super., 470, 465 A.2d 650 (Pa. Super. 1983); *Commonwealth v. Anderson, supra,* at 1067.

### Discussion:

This allegation of error concerns Commonwealth witness, Robert Poullos, who was a jailhouse informant who had a conversation with the Appellant in the committing area of the Blair County Prison.[1]

During our June 18, 2019 pre-trial hearing, it was acknowledged that at one point, Mr. Poullos was on suicide watch within the prison and eventually transferred to Torrence State Hospital. No further details were ever developed of record. It is conceded by the defense that as of the time of our pre-trial hearing, Mr. Poullos was competent to testify. [R.R.#41, 6/18/19, T., pp. 35-36].

The Appellant never further developed the record as it pertained to the relevant time frame when Mr. Poullos was under suicide watch or transitioned to Torrence State Hospital, as compared to when he had his conversation with the Appellant in the committing area of the Blair County Prison.

---

[1] Mr. Poullos' testimony is set forth in detail on pp. 91-92 of this Rule 125(a) Opinion below.

We were able to observe Mr. Poullos' demeanor during his testimony. There was no question in our mind that Mr. Poullos was fully competent to testify. Ultimately, Mr. Poullos' statement to police, wherein he provided information based upon his conversation with the Appellant, including the location of the expended shotgun shell hidden in the middle of the woods at the Appellant's father's home, was verified by police investigation.

We submit this alleged error lacks merit.

## 11. *Introduction of Inflammatory Autopsy Photographs.*

*Applicable Law:*

The admission of evidence is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *Commonwealth v. Alderman,* 811 A.2d 592, 595 (Pa. Super. 2002).

In determining whether evidence should be admitted, the trial court must weigh the relevance and probative value of the evidence against the prejudicial impact of that evidence. Evidence is "relevant" if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding the material fact. *Id.* citing *Commonwealth v. Reid,* 811 A.2d 530, 550 (2002).

70

The question of admissibility of photographs of a corpse in a homicide case is a matter within the discretion of the trial judge, and only an abuse of that discretion will constitute error. When trial judge is confronted with gruesome or potentially inflammatory photographs, the test for determining their admissibility is whether or not photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. *Commonwealth v. Schroth*, 388 A.2d 1034, 1036 (Pa. 1978).

A photograph which is not deemed to be inflammatory may be admitted so long as it has relevance and can assist the jury's understanding of the facts of the case before it. Where a photograph possesses gruesome or inflammatory qualities likely to inflame the passions of the viewer, the court must apply the "essential evidentiary value" balancing test. The rationale for the additional requirement of the "essential evidentiary value" balancing test where the exhibit possesses inflammatory potential is that a fair trial demands exclusion of this possible source of prejudice even though the evidence is otherwise relevant and competent, unless, that evidence is essential to proof of the prosecution's case. *Id.*, at 1036-1037.

71

A photograph will not be excluded merely because of its horrid or gruesome qualities, but rather, the more inflammatory the photograph, the greater the essential evidentiary value which must be demonstrated for it to be admitted. A photograph of a corpse is not per se potentially inflammatory for purposes of determining its admissibility. *Id.*, at 1037.

Admission of photographs is largely within discretion of the trial judge, and the fact that a photograph may be inflammatory or gruesome in itself is not sufficient to exclude it; but if such photograph is admitted, the trial judge should warn the jury not to allow its shocking nature to inflame their emotions or affect or influence their verdict. *Commonwealth v. Robinson*, 249 A.2d 536, 538 (Pa. 1969).

The admission of photographs by the trial judge or lower court will not be reversed except for palpable abuse of discretion. *Id.*

### Discussion:

We conducted a separate hearing on November 6, 2019 in the presence of counsel and the Appellant to review the autopsy photographs. We incorporate the transcript from said hearing in its entirety. [R.R. #20]. During the hearing, Attorney Weeks confirmed that the Commonwealth had met with Attorney Anastasi to review the photographs. The Commonwealth, on its own accord, eliminated from

consideration for use at trial over 100 photos from the autopsy itself. [R.R. #20, 11/6/19 T., p. 2]. The Commonwealth presented the autopsy photographs for which there was no objection and then the photographs for which there was an objection.

During the November 6, 2019 hearing, the Commonwealth agreed to crop and/or grayscale several autopsy photographs that were called into question. [R.R. #20, 11/6/19, T., pp. 3, 6, 12, 13-14, 15-16, 28 & 30].

We made certain rulings on the admissibility of the autopsy photographs on the record during our November 6, 2019 hearing, which we incorporate herein. We also took certain photographs under advisement and then entered a subsequent Opinion and Order on November 20, 2019, which we incorporate herein in its entirety. [R.R. #18].

We would also note that before the autopsy photos were shown to the jury, we provided the following cautionary instruction:

> BY THE COURT: Members of the jury, before we show you the autopsy photographs, I just want to instruct you as follows: Members of the jury, I just want to caution you at this time you are going to be shown certain autopsy photographs of the victim, David Hoover. Some of you may be troubled by these photos. It may invoke some emotion within you. It is very important, however, that you do not allow the autopsy photographs in any way to inflame your emotions or influence your verdict. It is important that you keep in mind that emotion and/or sympathy are not to be part of your assessment of the evidence nor ultimately your deliberations and have nothing to do with the duty that you are obligated to carry out. That duty is

to weigh all of the evidence fairly and impartially in fulfilling your role as the true finders of fact. Thank you.

[R.R. #54, 1/29/20 T., pp. 147-148].

Therefore, we submit that the court and counsel engaged in extensive efforts to lessen the gruesome nature of any autopsy photographs prior to trial. Further, we are satisfied that the autopsy photographs admitted into evidence were relevant and probative of the issues at hand and outweighed any prejudicial effect. The autopsy photographs were utilized by the Commonwealth's forensic pathologist expert, Dr. Kevin Whaley, to aid the jury in their understanding of the decedent's injuries and cause and manner of death. [R.R. #54, 1/29/20 T., pp. 147-157].

Finally, we provided the jury the cautionary instruction, as set forth above, so as to ensure that their emotions would not be inflamed, nor would the photographs affect or influence their verdict. As a result of the foregoing, we submit that this alleged error lacks merit.

## 12. *Denial of Motion to Suppress.*

Contained within the Appellant's Omnibus Pretrial Motion for Relief filed April 1, 2019, was a Motion to Suppress [R.R. #8, p. 11, ¶¶47-53]. The Commonwealth filed an Answer to the Appellant's Pretrial Motion for Relief on June 17, 2019. [R.R. #13].

We entered an Opinion and Order dated July 9, 2019 [R.R. #15] (which we incorporate and re-state herein) that addressed, *inter alia*, the Appellant's suppression motion as set forth below:

***Applicable Law:***

Where a motion to suppress has been filed, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible. ***Commonwealth v. Smith***, 784 A.2d 182, 186 (Pa. Super. 2001) citing ***Commonwealth v. James***, 486 A.2d 376 (Pa. 1985).

*Miranda* warnings are required whenever a person in custody is interrogated by law enforcement. A person is in custody whenever, "he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation." ***Commonwealth v. Chacko***, 459 A.2d 311, 314 (Pa. 1983). Further, whenever a defendant is in custody for *any* reason, he must be issued his rights prior to any interrogation. ***Id.***

The Commonwealth bears the burden of establishing whether a defendant voluntarily and knowingly waived his right to counsel. ***Commonwealth v. Meachum***, 711 A.2d 1029, 1032 (Pa. Super. 1998). A waiver must be explicit in

75

order to be effective. *Id.* Such explicit waiver may be an oral, written or physical manifestation. *Id.*

In order to determine the voluntariness of a waiver, it must be determined whether, "the waiver was the result of an intentional choice that was not subjected to undue governmental pressure. *Commonwealth v. Ellis*, 700 A.2d 948, 955 (Pa. Super. 1997). To determine whether the waiver was knowing and intelligent, we focus on, "whether the defendant was aware of the nature of the choice that he made in relinquishing his *Miranda* rights." *Id.* A waiver may be knowing and intelligent even though the person accused was medicated or under the effect of medication where there is no evidence of any impairment of cognitive functions. *Id.*

Before using a defendant's statement against him, the Commonwealth must establish by a preponderance of the evidence that the statement was given freely and voluntarily. *Commonwealth v. Nester,* 709 A.2d 879 (Pa. 1998). When a defendant is informed of his rights, and he understands them and still makes a voluntary and knowing statement, the statement is admissible. *Commonwealth v. Baker,* 614 A.2d 663 (Pa. 1992).

In order to determine the voluntariness of a confession and the validity of the waiver of the right to remain silent, it is necessary to consider the totality of the circumstances. *Commonwealth v. Perez,* 845 A.2d 779 (Pa. 2004); and *Commonwealth v. Baez,* 720 A.2d 711 (Pa. 1998).

When assessing voluntariness pursuant to the totality of the circumstances, a court should look at the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion. *Commonwealth v. Edmiston,* 634 A.2d 1078 (Pa. 1993).

*Miranda* warnings are not required where there is no custodial interrogation. A person is in "custody" for purposes of a custodial interrogation, when he is physically deprived of his freedom in any significant way, or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. *Commonwealth v. Nester,* 709 A.2d 879 (Pa. 1998).

77

In addition, the courts have indicated that in evaluating the voluntariness of a confession, the Supreme Court will give great weight to the fact that a defendant was fully apprised of and expressly waived his *Miranda* rights, including the right to counsel and the right to remain silent, before any substantive questioning began and well before any alleged inducement to confess. ***Commonwealth v. Templin***, 795 A.2d 959 (Pa. 2002).

***Discussion:***

During our June 18, 2019 hearing, Detective Sergeant Terry Merritts testified. We found his testimony to be credible in all respects. As a result, we found that the Appellant was in custody at the time he provided a statement to Detective Sergeant Merritts within the intake area of the Altoona Police Department station. We further found that the Appellant was provided his *Miranda* warnings, which the Appellant acknowledged and that he voluntarily signed a rights waiver form. The Appellant then provided a statement for which there is both an audio and visual recording. At no time did the Appellant ever request an attorney, nor did he ever indicate that he wanted to cease cooperating and stop providing answers. [R.R. #41, 6/18/19 T., pp. 45-47]. There is no evidence that the Appellant was subject to undue influence, pressure or coercion of any manner whatsoever. [R.R. #41, 6/18/19 T., pp. 47-48].

78

During his questioning, the Defendant responded to the questions in an appropriate manner. [R.R. #41, 6/18/19 T., p. 52]. He exhibited no signs of being under the influence of any drugs, alcohol or medication. [R.R. #41, 6/18/19 T., p. 57].

Detective Sergeant Merritts had interviewed the Appellant on a prior occasion, wherein a juvenile came forward and reported that he had been sexually assaulted. The juvenile identified the Appellant as a witness to the prior sexual assault. Detective Sergeant Merritts interviewed the Appellant as a potential witness. [R.R. #41, 6/18/19 T., pp. 43-44]. During that interview, the Appellant was provided his *Miranda* warnings [R.R., #41, 6/18/19 T., pp. 51 & 58] and voluntarily waived same and provided a statement to Detective Sergeant Merritts. This entire interview lasted less than ½ hour. [R.R. #41, 6/18/19 T., p. 49]. There was no evidence to support the Appellant's claim that Detective Sergeant Merritts was "working closely" with the Appellant on this unrelated sexual abuse investigation. The mere fact that Appellant provided a voluntary statement to Detective Sergeant Merritts in an unrelated case has no bearing on the voluntariness of the statement provided by the Appellant in this case after being provided his *Miranda* warnings and waiving same. Thus, the Appellant's Motion to Suppress was denied and dismissed.

[R.R. #15, Opinion and Order dated July 9, 2019, pp. 14-19].

79

### 13. _Denial of Motion to Sever._

This issue was addressed in our pre-trial Opinion and Order dated April 29, 2019 [R.R. # 11], which we incorporate and re-state herein.

**_Applicable Law:_**

The Defendant has filed a Motion to Sever based upon **Pa.R.Crim.P. 583**, which states:

> The court may order separate trials of offenses or defendants, or
> provide other appropriate relief, if it appears that any party may
> be prejudiced by offenses or defendants being tried together.

The purpose of the compulsory joinder statute, viewed as a whole, is twofold: (1) to protect a defendant from "the governmental harassment of being subjected to successive trials for offenses stemming from the same criminal episode;" and (2) to ensure "finality without unduly burdening the judicial process by repetitious litigation." **Commonwealth v. Fithian,** 961 A.2d 66, 76 (Pa. 2008), quoting **Commonwealth v. Failor,** 770 A.2d 310, 313 (Pa. 2001) and **Commonwealth v. Hude,** 458 A.2d 177, 180 (Pa. 1983).

To determine whether various acts constitute a single criminal episode, we are to consider two factors: (1) the logical relationship between the acts, and (2) the temporal relationship between the acts. *Commonwealth v. Hude, supra.*, 458 A.2d at 181, 183.

In defining what acts constitute a single criminal episode for purposes of the compulsory joinder rule, the court must consider the temporal sequence of events and the logical relationship between the acts. A "logical relationship" exists between the criminal acts which are the subject of the compulsory joinder claim where the sequence of the criminal acts reveals a substantial duplication of issues of law and fact. *Commonwealth v. Anthony,* 717 A.2d 1015 (Pa. 1998).

*Discussion:*

The Appellant sought to sever the charges of Possession with Intent to Deliver/Delivery, Criminal Conspiracy (object crime being PWID) and Theft by Unlawful Taking from the remaining offenses. The Appellant argued that the drug offenses involved two different types of drugs, multiple people and that evidence of same would be prejudicial to the defense. Further, the Appellant argued that the drug

81

transaction occurred four hours prior to the shooting and was not part of the same criminal episode.

Based upon our findings of fact set forth in our April 29, 2019 Opinion, we agreed with the Commonwealth that the crimes the Appellant sought to sever "not only go to the heart of the issue as to whether this Appellant has a justification defense available to him, and whether this Appellant can avail himself of the Castle Doctrine, but they provide the motive for everything that happened after the drug transaction." [R.R. #10, 4/2/19 T., pp. 6-7].

We found as follows: Even though the subject incident may have occurred over several hours, there can be no dispute that it constitutes a single continuous criminal episode. There is both a logical and temporal relationship between the acts. See *Commonwealth v. Hude, supra.* The earlier drug transaction "gone bad", where the Defendant and Mr. Clemens took $250 from Mr. Hoover without any intention of providing him the 8-ball of cocaine, formulates the basis and provides an explanation for everything that occurred later in the day, including the confrontation and ultimately the shooting of Mr. Hoover by the Appellant. To sever these specific counts would leave the jury confused and speculating on why there was any confrontation between

Mr. Hoover and the Appellant in the parking lot on July 26, 2018. As a result, the Defendant's Motion to Sever is **denied and dismissed.**

Thus, we submit this alleged error lacks merit.

## 14. *Denial of Motion for Judgment Notwithstanding the Verdict.*

This claim was raised in the Appellant's Amended Post-Trial Motion [R.R. #38], which we addressed in our Opinion and Order entered July 30, 2020 [R.R.#56]. We incorporate and re-state same below.

***Applicable Law:***

*Admission of Evidence:*

The admissibility of evidence is at the discretion of the trial court, and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error. ***Commonwealth v. Ballard***, 80 A.3d 380, 392 (Pa. 2013).

*Sufficiency of Evidence:*

The standard applied in reviewing the sufficiency of evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. On a challenge to the sufficiency of the evidence, the reviewing court may not weigh the evidence and substitute its judgment

for that of the fact-finder. On a challenge to the sufficiency of the evidence, facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. *Commonwealth v. Troy,* 832 A.2d 1089, 1092 (Pa. Super. 2003).

Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. On a challenge to the sufficiency of the evidence, the entire record must be evaluated and all evidence actually received must be considered. The trier of fact, while passing on the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Id.*

*Weight of Evidence:*

The finder of fact is the exclusive judge of the weight of the evidence as the fact finder is free to believe all, part, or none of the evidence presented and determines the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact; therefore, it will reverse a jury's verdict and grant a new trial only where the verdict is so contrary to the evidence as to shock

84

one's sense of justice. *Commonwealth v. Rabold*, 920 A.2d 857, 860 (Pa. Super. 2007).

*Discussion:*

To obtain a first-degree murder conviction, the Commonwealth must demonstrate that a human being was unlawfully killed, the defendant perpetrated the killing, and the defendant acted with malice and a specific intent to kill. *Commonwealth v. Mattison,* 82 A.3d 386, 392, (Pa. 2013).

Specific intent to kill, as an element of first-degree murder, can be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body. *Id.* at 392.

First, during the initial investigation, the Appellant, after being provided his *Miranda* warnings, provided a statement to Sergeant Merritts of the Altoona Police Department that he had shot and killed David Hoover in the Bethany Lutheran Church parking lot on the date in question, using a single shot shotgun. [RR. #45, 1/30/20, T., pp. 90-91]. Therefore, the identity of the shooter, the type of weapon utilized, and the cause of death were never at issue.

This case boils down to the Appellant, Dillion Bryan and Edward "Cowboy" Clemens lying in wait for Mark Adams and the decedent, David Hoover, in the church parking lot at Bethany Lutheran Church. On July 26, 2018 at approximately 2:16 p.m., there was a prior drug transaction at the Sheetz Store on Chestnut Avenue wherein Edward "Cowboy" Clemens rode with the Appellant to the Sheetz Store. Clemens entered the store and made a drug transaction with David Hoover in the men's restroom. The agreement was that Clemens would provide an 8 ball of cocaine for $250. Within the Sheetz Store, Clemens obtained the $250 from Hoover and also provided two Klonopin pills for $10. The two Klonopin pills came from the Appellant as there were prior arrangements between Clemens and the Appellant to obtain such Klonopins, including specifically a text message about obtaining "pins". It was the intent of both Clemens and the Appellant to "burn" Hoover. They had no intent to provide him the 8 ball of cocaine on the date in question. Clemens confirmed that the Appellant was part of the plan to burn Hoover. Clemens claimed that Hoover had stolen $360 from an envelope within his residence at a prior time. Clemens took the $250, returned to Stiver's vehicle, and they drove away. [R.R. # 47, E. Clemen's testimony, 1/28/20, pp. 111-114]. Hoover went to Mark Adam's vehicle and waited.

86

Clemens had told him to wait and that he would be back in approximately 15 minutes. [R.R. #47, M. Adams, 1/28/20, pp. 50-53].

After Hoover and Adams waited about 30-45 minutes, they realized that they had been burned. Hoover tried to call Clemens twenty-five (25) times without success. [R.R. # 54, Detective D. Dey, 1/29/20, pp. 184-189; [R.R. #45, Sergeant Merritts, 1/30/20, p. 101]. At that time, Adams returned to work. [R.R. #47, M. Adams, 1/28/20, pp. 53-54].

After Adams got off work at 4:00 p.m., he picked up Hoover and they drove through Altoona looking for Clemens with the intent to get their money back. They found Clemens with 2 other people (including the Appellant) in an alley at Third Avenue. Adams revealed to Hoover that he had a bat in the trunk of his white Chevrolet Malibu. Hoover retrieved the bat and walked over toward Clemens and his two companions. Clemens yelled "I'll get your money", at which time the other two individuals (the Appellant and Bryan) got into the Ford Fusion and left. [R.R. #47, M. Adams, 1/28/20, pp. 54-60]. There was ultimately a high speed chase through Altoona wherein Adams and Hoover lost the Appellant and Clemens. [R.R. #47, M. Adams, 1/28/20, p. 60]. The Appellant ultimately drove to the church parking lot and parked the vehicle. Clemens was walking along the alley and then hid behind a

dumpster. He also hid hypodermic needles, which were later found by police. [R.R. # 47, Patrolman Trent, 1/28/20, pp. 19-20]; [R.R. # 53, Patrolman M. Angermeier, 1/27/20, p. 188]. When the Appellant arrived on scene and parked his vehicle, Clemens walked toward the vehicle. The Appellant got out of the vehicle, went to his trunk, obtained the shotgun and put it in his backseat. [R.R. #45, Sergeant Merritts, 1/30/20, pp. 92-93]. The Appellant admitted this in his statement to Sergeant Merritts. The white Chevrolet Impala, in which Adams was driving and David Hoover was a passenger, then stopped in the alley by the parking lot. [R.R. # 47, M. Adams, 1/28/20, pp. 62-63]. Hoover got out of the vehicle, walked around the back of the Appellant's blue Ford Fusion, went along the passenger side, carrying a baseball bat. Hoover did not possess a gun. At no time did Hoover enter the vehicle, nor attempt to enter the vehicle, nor attempt to remove the Appellant or Bryan from the vehicle. At no time did Hoover threaten anyone. The Appellant subsequently backed up his vehicle, reached out the driver's window and shot Hoover with the 12-gauge shotgun that he obtained from his father's residence. The Appellant then drove away at a high rate of speed. [R.R. #47, M. Adams, 1/28/20, pp. 63-67, 81-82].

Clemens confirmed that when he got back into the blue Ford Fusion after the incident (which he claimed he did not witness), that the Appellant stated "I killed him," referring to Hoover. [R.R. #47, E. Clemens, 1/28/20, p. 119].

The forensic pathologist, Dr. Kevin Whaley, testified that Hoover was approximately 10 to 12 feet away from the Appellant when the shot occurred. Hoover subsequently fell to the ground and laid dying in the parking lot, surrounded by a pool of blood. [R.R. #54, Dr. Whaley, 1/29/20, pp. 145,158-161]. These events were confirmed by the testimony of Mark Adams (whom the jury found to be a credible witness), the surveillance videos of neighbors, and as re-created by the computer generated animation (CGA). The entire incident lasted only approximately 40 seconds. After the shooting, the Appellant was observed speeding down an alleyway, captured by surveillance video. [R.R. #47, Patrolman G. Trent, 1/28/20, p. 32; M. Adams, 1/28/20, p. 67]; [R.R. #45, Sergeant Merritts, 1/30/20, p. 115]. Bryan was in the Appellant's car. An individual who appeared to be Clemens was seen running from the scene. Adams drove his white vehicle around Hoover's body, out the alley, then took a left onto Second Avenue and parked. [R.R. #46, M. Adams, 1/31/20, pp. 37-38]. Adams called 911 and waited on scene until the police arrived.

[R.R. #47, M. Adams, 1/28/20, pp. 67-68, 72]; [R.R. #53, Patrolman M. Miller, 1/27/20, pp. 122-124]; [R.R. #45, Sergeant Merritts, 1/30/20, p. 79].

At all times Adams cooperated with the police. His statement to the police was consistent with his testimony at trial. [R.R. # 45, Sergeant Merritts, 1/30/20, pp. 79 & 128]. The Commonwealth's evidence also showed that the Appellant had two means of retreat, driving through the alley, as he did after the shooting, or taking a right within the church parking lot and leaving by another means of ingress/egress. [R.R. #47, M. Adams, 1/28/20, p. 67; video surveillance). The jury clearly found that the Appellant did not fulfill his duty to retreat, thus defeating his self-defense claim.

We also ruled as a matter of law that the Castle Doctrine did not apply since under 18 Pa. C.S.A. §505 (2.1), there was no evidence that Hoover was in the process of unlawfully and forcibly entering or attempting to forcibly enter the Appellant's vehicle, nor any evidence that he was attempting to remove the Appellant from his vehicle. Therefore, there could be no evidence that the Defendant, as the actor, knew or had reason to believe that Hoover was unlawfully and forcibly entering his vehicle. 18 Pa. C.S.A. §505 (2.1).

Further, under 18 Pa. C.S.A. §505 (2.2), we found that the Appellant was engaging in criminal activity and/or using the occupied vehicle to further criminal activity, including but not limited to possession of a controlled substance on both his person and in his vehicle console; carrying a loaded weapon within his vehicle; as well as the prior drug transaction and theft of $250 that occurred in Sheetz, which is certainly related to the later shooting in the parking lot.

In further support of the jury's finding of Murder in the First Degree, there was the testimony of Robert Poullos. Poullos was in the committing area of the Blair County Prison when the Appellant and Clemens were brought in after the incident. Poullos did not know the Appellant at the time, but knew Clemens. The Appellant admitted to Poullos that he was involved in the homicide and provided details. The Appellant said he "shot some guy over a drug deal." He explained how they were supposed to give this guy (referring to Hoover) cocaine, but he owed them money and they weren't going to give it to him. The Appellant said "Dillion" and Clemens were with him. The Appellant told Poullos the shooting occurred in a parking lot. The Appellant explained how he reached into his back seat for a pre-loaded shotgun and shot out the driver's window. He described it as being "awkward." He said the victim was turning around and that he "aimed for the throat" and that is where he shot him.

91

Poullos testified that the Appellant also made a statement that he "would have run the fat fucker over" but that he didn't want to "mess up my car and put a dent in it." The Appellant [indicated] that he then drove to his father's house and cleaned the gun. [R.R. # 54, R. Poullos, 1/29/20, pp. 68, 71-78, 82-85].

Poullos also testified as to his conversation with Clemens in the commitment area at the county jail. Clemens revealed to him that the Appellant had asked him to hide the shotgun shell and that he complied, hiding it under a rock in the woods. Poullos confirmed that after these conversations with the Appellant and Clemens, he asked to speak to Sergeant Merritts. [R.R. #54, R. Poullos, 1/29/20, pp 86-87].

What is critical is that Poullos was in an isolated area within the prison and had no access to any tv, radio, or social media, thus bolstering his credibility as a witness. [R.R. #54, R. Poullos, 1/29/20, p. 70]. The shotgun shell was subsequently found by the police under a rock at a camp site at John Stiver, Sr.'s residence, exactly where Clemens told Poullos it would be. [R.R. #45, Sergeant Merritts, 1/30/20, pp. 89-90].

Further, the testimony revealed that the police arrived at the crime scene within a few minutes after the shooting and fully secured the premises and preserved the evidence. [R.R. #53, Sergeant D. Vasil, 1/27/20, p. 84; Patrolman M. Miller, 1/27/20,

p. 122]; [R.R.#45, Sergeant Merritts, 1/30/20, p. 76]. It is significant that the only person who stayed on scene was Mark Adams. The Appellant, Bryan and Clemens all fled from the scene.

The Appellant's father, John Stiver, Sr., and his brother, Brad Stiver, both confirmed that the 12-gauge shotgun used to shoot Hoover belonged to the Appellant, via stipulation entered on the record by counsel. [R.R. #47, 1/28/20, pp. 174-177].

The Commonwealth proved that there were 8 calls/texts between the Appellant and Clemens between 5:00 p.m. and the time of shooting. The 911 call was made at 5:34 p.m. In fact, a text message from the Appellant to Clemens approximately 5 minutes before the 911 call said "I am here". [R.R. #45, Sergeant Merritts, 1/30/20, p.111]. This is further evidence that there was a plan formulated by the Appellant and Clemens and that the Appellant was lying in wait for the victim.

There was no credible evidence that Hoover or Adams ever had a gun in their possession on the date of incident. In fact, there is no credible evidence that Hoover ever made any threatening comments to the Appellant. It is clear that the jury discounted the testimony of Kenneth Lafferty, who claimed that during a telephone conversation on July 26, 2018 with his friend, David Hoover, that Hoover made a comment that his "buddy has a gun and is going to kill them." Lafferty also

93

acknowledged that he was friends with the Appellant and the Appellant's family. The Commonwealth impeached his credibility by presenting evidence as to his *crimen falsi* convictions in Pennsylvania, Maryland and Florida. [R.R. #46, R. Feathers, 1/31/20, pp. 44 and 46].

Finally, we provided the jury the charge of consciousness of guilt, which was supported by the evidence. The Appellant fled the scene, as set forth above. After the Appellant picked Clemens up, the Appellant drove to his father's residence, where he hid his vehicle in the brush behind an old garage at his father's house. The Appellant also returned the gun to his father's house [R.R. #47, E. Clemens, 1/28/20, pp. 119-121], but hid it in a closet on the porch obscured by clothes that were hanging. [R.R. #47, Detective C. Moser, 1/28/20, p. 186];[R.R. #45, Sergeant Merritts, 1/30/20, p. 94]. At that time, the Appellant borrowed a truck and traveled with Clemens back to his apartment which he shared with Joshua Creswell. While there, Creswell shaved the Appellant's head. The Appellant also gathered camping gear. [R.R. #47, E. Clemens, 1/28/20, p. 121; J. Creswell, 1/28/20, p. 151]; [R.R. #54, Patrolman D. Dey, 1/29/20, pp. 180-181]. After purchasing cigarettes and a case of beer, the Appellant and Clemens drove back to Mr. Stiver, Sr.'s house. The Appellant pitched a tent in an area of the woods that could not be seen from the house or the

94

road. The Appellant told Clemens to hide the shotgun shell. [R.R. #47, E. Clemens, 1/28/20, pp. 122-124]. The Appellant then hid in a tent and did not come out until the police arrived on scene and collapsed his tent, cut it open and pulled him out, after he refused to abide by verbal commands to exit the tent. [R.R. #54, Sergeant T. Walters, 1/29/20, pp. 44-47, Officer R. Benzel, 1/29/20, pp. 50-54, 56-62].

Based upon the foregoing, and in viewing the evidence in light most favorable to the Commonwealth as the verdict winner, we found that the evidence was more than sufficient to support a first degree murder conviction.

[R.R. #56, 7/30/20 Opinion, pp. 18-29].

We submit there is no merit to this alleged error.

**Conclusion:**

Based upon the foregoing, we submit that each of the Appellant's alleged errors lack merit and respectfully request your Honorable Superior Court to affirm the judgment of sentence.

Respectfully Submitted,

The Honorable Timothy M. Sullivan

October __28__, 2020

95